Clifton J. McCLELLAND, June McClelland, Joseph Pringle, Robert Jones, Lillie Jones, David E. Alloway, Appellees,

v.

Ruth MASSINGA, in her official capacity as Secretary of the Department of Human Resources of the State of Maryland, and Louis Goldstein, in his official capacity as Comptroller of the Treasury of the State of Maryland, Appellants.

No. 85–1138.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 7, 1985.

Decided March 18, 1986.

Rehearing and Rehearing In Banc Denied April 17, 1986.

Diana G. Motz, Asst. Atty. Gen., Baltimore, Md., (Stephen H. Sachs, Atty. Gen., Joseph B. Spillman, Asst. Atty. Gen., Baltimore, Md., Andrew H. Baida, Baltimore, Md., on brief), for appellants.

Paula M. Carmody (Andrea G. Green, UAW–GM Legal Services Plan, Baltimore, Md., on brief), for appellees.

Before RUSSELL and MURNAGHAN, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

## DONALD RUSSELL, Circuit Judge:

The plaintiffs/appellees in this 42 U.S.C. § 1983 action seek a declaratory judgment finding the Maryland Statutory Tax Refund Interception Program (TRIP)[1] unconstitutional and enjoining its enforcement. Four of the plaintiffs are fathers who, obligated under valid current Maryland court decrees for child support, are allegedly delinquent for more than sixty days in payment of such support; and the other two

plaintiffs are the present spouses of two of the fathers. The defendants are the Secretary of Human Resources[2] and the Comptroller of the Treasury, both of the State of Maryland. The district judge found the statute violative of due process in failing to give notice of certification for intercept to the non-obligated spouse of two of the plaintiffs and in failing to provide the plaintiffs with a pre-intercept hearing.[3] The defendants have appealed. We reverse.

TRIP, like similar programs in other states represents a mechanism for assisting the State and dependent children, or their legal custodians, in obtaining child support from court-obligated parents who have failed to make payments as required. It was initiated and enacted under the authorization of 26 U.S.C. § 6402(c). The federal authorizing statute was enacted to encourage States to establish voluntarily such collection mechanisms. In 1984 the statute was amended to change the requirement of a State procedure from that of a voluntary character on the part of the State to a mandatory one.[4] As both the relevant federal and the state statutes declare, the collection of past due child support of dependent children, under current valid court-ordered decrees, whether in favor of the State which may have advanced the payments or in favor of the dependent children or the one having their custody, is a legitimate matter of public concern and sustainable as such.[5]

1. Md.Code Ann. Art. 88A § 59(e) (1974 Repl. Vol.) (1983 Cum.Supp.) *repealed and re-codified* at Md.Fam.Law Code Ann. § 10–113 (1984).

2. The Child Support Enforcement Administration (CSEA), which administers TRIP is a division of this Department.

3. The district court opinion is reported, *McClelland v. Massinga,* 600 F.Supp. 558 (D.Md.1984).

4. For a *statement of the scope of this federal* statute as amended in 1984, *see* 1984 U.S.Code Cong. & Ad.News 2397, 2425:

(3) State income tax refund offsets.—States that have State income taxes must provide for the withholding of any State tax refunds payable to a non-custodial parent who owes overdue child support payments. These tax refund withholding procedures must be applica-

ble to AFDC cases and to non-AFDC cases. The withholding procedure must be used for interstate as well as intrastate cases. The State must send the individual prior notice of the proposed offset and information on the procedures to be followed to contest the withholding. The offset procedure must be consistent with the due process procedures of the State.

5. The Committee's proposal to create a new child support enforcement program reflected a desire to improve in a very significant way the collection of support on behalf of children with absent parents. In presenting its rationale for the new program, the Committee stated:

"The Committee believes that all children have the right to receive support from their fathers. The Committee bill ... is designed to

The procedure as provided under the challenged Maryland statute and its implementing regulations is clear and definite. The Administrator of the Program may certify each year to the Comptroller any person who is more than sixty days in arrears in his court-obligated child support payments "under the most recent court order." At the same time the Administrator is required to notify the person concerned of the filing of the certification and of his right to request an investigation of the arrearage if he deems the certification inaccurate or improper. If there is a request for an investigation, the Administrator is to conduct an investigation into the accuracy of the reported arrearage. If the certification is found to be in error, he is to withdraw the certificate. Under the State Regulations, the scope of the investigation is limited to "the existence or the amount of the arrears." The report of the investigation must be made available to the obligor-parent thirty days from the date his objection was filed. If the certificate is not disputed or, if found correct after investigation, the Administrator is to forward the certification to the Comptroller who shall "withhold and pay to the Administration any income tax refund due to the obligor, in an amount not more than the amount of the arrearage"; otherwise, he is to withdraw the certificate. When it is determined that the obligor-parent is entitled to a tax refund, the Comptroller shall intercept the tax refund and he shall, within fifteen days of the intercept, notify the obligor of the intercept, as well as both of his right to appeal such intercept and of the method of doing so. Should the obligor appeal, he is to be accorded an administrative hearing before an impartial review officer, with the right to have a record made of the proceedings, to be represented by counsel, to offer testimony, to present witnesses, and to submit oral argument. From an adverse decision of the adminis-

trative law judge, the obligor has the right to judicial review. Where the delayed support payments have not been assigned to the State under the NAFDC Program, the Regulations provide that the Comptroller shall delay payment of such part of the refund as is due to be paid on the obligors' support obligations for 30 days to allow the obligor time to appeal. If there is an appeal, payment shall be made by the Comptroller as the later decision of the appeal may adjudge, but if there is no appeal within time, such part of the refund as is payable under the court order shall be paid over to the party entitled to the support payments.

The plaintiffs in the complaint would fault the procedure under the statute on due process grounds for these reasons: (1) Failure to provide an opportunity for a hearing before interception of the tax refund; (2) Failure to give adequate certification notice to the obligor's spouse where the obligor and his spouse have filed a joint tax return; and (3) Failure to advise the party whose tax refund has been intercepted of possible defenses to the intercept. The defendants, by their answer or motion, raised the mootness of the claim of two of the plaintiffs because their certifications had been withdrawn and their refunds released to them. In addition, they alleged that the two spouses of the plaintiffs McClelland and Jones, who had no income of their own involved in the intercepted refunds and, therefore, had no personal interest in the tax refunds, lacked standing to challenge the intercepts. The defendants also asked the court in their answer to abstain in favor of on-going state proceedings, or, in any event, to require the presence as parties to the action of the obligees who were to receive the support payments. Finally, the defendants pled the constitutionality of the statute.

After joinder of issues, both parties filed motions for summary judgment on the

help children attain this right, including the right to have their fathers identified so that support can be obtained. The immediate result will be a lower welfare cost to the taxpayer but, more importantly, as an effective sup-

port collection system is established fathers will be deterred from deserting their families to welfare and children will be spared the effects of family breakup."
(1984) U.S.Code Cong. & Ad.News 2402.

record established. The district judge granted the motion of the plaintiffs and denied the motion of the defendants. In his order, the district judge dismissed the objections to standing and mootness and the request for abstention by the defendants and addressed the merits of plaintiffs' constitutional attack on the statutory procedures. On the merits, he held that the statutory procedures violated the due process rights of the defaulting obligors by failing to accord them "a pre-intercept hearing." He, also, found that the due process rights of the non-obligated spouses, who admittedly had not contributed to the tax payments resulting in the intercepted tax refund, had been violated by the State's failure to give them "notice prior to interception." He found without merit plaintiffs' claim of a due process violation in the failure under the challenged procedures to provide notice to the defaulting obligors of "a list of all possible defenses" to the proceedings. He held in this regard that it would be "sufficient if the notice clearly state[d] the basis for the action against the taxpayer and outline[d] the factors which will be considered at a hearing, allowing the taxpayer to prepare a defense and present whatever objections are available." The district judge did further find that the notice of intercept should include as a possible ground of objection by the obligor that his arrearage was less than 60 days.

The district judge's requirement that the notice of possible grounds of objection to the intercept include the claim that the arrearages were not more than 60 days old was accepted by the defendants and is no longer an issue in the case. The defendants have also not stated as a ground of appeal the dismissal of their abstention claim. They do contest the ruling by the district court on the standing issue both of the non-obligated spouses and of the obligors who did not contest their arrearage of more than 60 days, and they challenge on appeal the district court's requirement of a full pre-intercept hearing. The plaintiffs, on the other hand, have not appealed the district court's dismissal of the claim that

the notice of intercept provide the obligors with "a list of all possible defenses." There are accordingly but two issues posed by the appeal: 1. Did the two non-obligated spouses who made no contribution to the tax payment resulting in the refund have standing "to contest the procedures followed in making" the intercept, and did the two obligors who did not dispute their arrearage have standing? 2. Were the obligated plaintiffs entitled to pre-intercept notice?

We consider first the contention whether non-obligated spouses, who had made no contribution to the income taxes paid and, therefore, allegedly had no claim to a refund on the taxes paid, had standing to contest the validity of the intercept proceedings. It is undisputed that the two non-obligated spouses-plaintiffs in this case did not contribute to the tax payments resulting in the tax refund in issue. The defendants concede that, if they had contributed to the tax payments, the non-obligated spouses would be entitled to some form of notice before interception of a tax refund resulting from such payments. It is their position, however, that if the refund arises wholly from tax payments made by the delinquent father on the father's individual income, the non-obligated spouse has no interest in the refund and the defendants are not obligated to give them notice of either the certifications or of the intercepts. It is plaintiffs' argument, in response, that a tax refund resulting from the filing of a joint tax return, irrespective of which party's income was involved, and irrespective of who paid the tax, qualifies as property of the husband and wife as tenants by the entireties under Maryland law. Accordingly, under this theory, it is argued that the spouses June McClelland and Lillie Jones had an interest as tenants by the entireties in the tax refunds resulting from payments made by their husbands on the latters' joint tax returns in these cases and had standing as plaintiffs in this action to contest the validity of the intercept procedure.

The contention of the non-obligated wives finds, in our opinion, no support in the law providing for the establishment of ownership by the entireties under the law of Maryland. While the existence of estates by the entireties, both in personal and real property is well recognized under the common law of Maryland, *Jones v. Jones*, 259 Md. 336, 270 A.2d 126, 127 (1970), such an estate arises only where there has been a manifest intention by the parties, or one of them, to create such an estate. This rule is illustrated by the recent decision in *Diamond v. Diamond*, 298 Md. 24, 467 A.2d 510 (1983). In that case, a check was issued payable to a husband and wife, as well as to their attorney, in settlement of two claims of the husband and wife. The former wife of the husband attached the check for application on a judgment held by her against her erstwhile husband. The husband and the new wife claimed the check and its proceeds as property held in the entireties and therefore immune from attachment to satisfy the debts solely of the husband.

The court in *Diamond* rejected the claim, finding there was no evidence of any intention on the part of the husband and wife to impress on the check or its proceeds an estate by the entireties, declaring that "in order to create a tenancy by the entireties there must be evidence of an intent to transfer property previously held by an individual to the marital unit." *Id.* 467 A.2d at 514. It recognized that there were some situations where such an intention on the part of the creator could be inferred to exist such as when "one spouse has contributed the entire purchase price, ... directing that it be titled as tenants by the entireties [in which case it can be said that] he has manifested a positive intent to create the estate" or, when one of the two performs "a positive action" such as creating a bank account in the couple's joint name, "thereby evidencing an intent to create a tenancy by the entireties." *Id.* 514, quoting *Jones v. Jones*, 259 Md. at 340, 270 A.2d 126. But it held that the issuance by the insurance carrier of a check jointly payable to the husband and wife did not evidence an intention by the husband and wife to create an estate by the entireties.

We think *Diamond* dispositive of the standing of the obligated spouses to maintain as plaintiffs this proceeding. It is manifest that, in making the payment pursuant to a joint tax return, the husbands in this case were not intending to create an interest in any possible overpayment in favor of their wives as tenants by the entireties; as the district judge correctly opined, the husbands were seeking the advantage that would accrue to them as taxpayers by filing a joint tax return. At the time they filed their returns, the husbands presumably had no idea whether they were entitled to refunds or whether the State would voluntarily grant them refunds. They had no more basis to assume that they retained any interest in the payment they made to the State than when they paid any other obligation. To read in such a payment, though made pursuant to a joint tax return, an intention to create a tenancy by the entireties would be pure fantasy. Nor was the State creating an estate by the entireties by issuing the refund check in the name of the husband and wife; that method was used simply to assure that each party received such of the refund as he or she by his or her contribution, was entitled to receive on the basis of his share in the overpayment. This is consistent with the holding in *Diamond v. Diamond*, 298 Md. 24, 467 A.2d 510 (1983).

Federal courts have had occasion to consider the interests of the non-contributing wife in tax refunds made in connection with joint federal tax returns of the husband and wife covering earnings solely of the husband under a federal TRIP Program. Though these decisions are not controlling in this case which must be decided under Maryland law, the Maryland legislature has "deliberately and intentionally pronounced a doctrine of conformance between the State income tax law and the federal income tax law," *Katzenberg v. Comptroller of Treasury*, 263 Md. 189, 282 A.2d 465, 470 (1971), and the State law was written "with both eyes on the federal tax

laws," *Comptroller v. Chesapeake Corp.*, 54 Md.App. 208, 458 A.2d 459, 466 (1983). It, therefore, seems appropriate to consider these federal decisions construing and applying federal tax law in applying the Maryland law. Perhaps the earliest relevant federal decision is *Rosen v. United States*, 397 F.Supp. 342, 344 (E.D.Pa.1975). In that decision, the court said "that the filing of a joint [tax] return does not have the effect of converting the income of one spouse into the income of the other" and that "a joint income tax return does not create new property interests for a husband or wife. in each other's income tax overpayment." *See to the same effect: Wollman v. United States*, 571 F.Supp. 824, 828 (S.D.Fla.1983); *Jahn v. Regan*, 584 F.Supp. 399, 410 (E.D.Mich.1984); *Coughlin v. Regan*, 584 F.Supp. 697, 706, n. 14 (D.Md.1984). Following this reasoning, the Court in *Gens v. United States*, 615 F.2d 1335, 1342, 222 Ct.Cl. 407 (1980) declared:

> It is well settled that "[s]pouses filing a joint return have separate interests in any overpayment, the interest of each depending on his or her income, i.e., an overpayment is apportionable to a spouse to the extent that he or she contributed to the overpaid tax."

■ These federal decisions support the conclusion that the mere filing of a joint tax return by a husband and wife does not render the property taxed or the tax paid joint property or property held by the two as tenants by the entireties. We agree with that conclusion. Further, the Maryland decisions would require an intention to create an estate by the entireties for the existence of such an estate. It follows under both federal and state decisions that there is no constitutional requirement that notice of the certification or of the intercept under the State Program be given a non-obligated spouse who had no interest in either the tax payment made or the refund of any overpayment of such tax. This conclusion, however, applies solely in these specific cases in which the non-obligated spouse has made no contribution to the tax payment; if the spouse has made some contribution, he or she does have an interest in the refund and must be given notice of the certification.

■ The defendants also questioned the standing of the plaintiffs McClelland and Alloway because they did not "dispute that they are indeed delinquent in child support payments" and therefore were without a personal stake in the litigation. The district judge, however, found that these plaintiffs complained that the procedures whereby their property in the tax refunds had been taken (i.e., taken without a prior administrative hearing) violated due process standards and held that they had "standing to challenge the state's procedures in taking their property, regardless of the fact that their refunds may have been legitimately subject to interception." He relied primarily on *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), in support of this ruling. We agree with the district court that the plaintiffs had raised by their complaints an issue in which McClelland and Alloway had an interest or stake, i.e., whether they were entitled under due process to a pre-intercept hearing, even though, as the district judge correctly observed, they may not have prevailed later at the hearing on that substantive issue. It is the teaching of *Carey* that the right to procedural due process is " 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions, and because of the importance to organized society that procedural due process be observed." For this reason it sustained the plaintiff's standing in that case to assert his due process violation even though he had no valid substantive claim. 435 *Id.* at 266, 98 S.Ct. at 1053. That ruling is applicable in this instance and sustains these plaintiffs' standing to sue.

■ The real substantive issue in this case, however, is the claim of the plaintiffs-obligors that they are entitled to a hearing under due process principles before being deprived under the State TRIP Program of their right to a tax refund due them by the

State Revenue Department. It may be conceded in considering this issue that the obligated plaintiffs have a property interest in such tax refunds and "that some form of hearing is required before an individual is *finally* deprived of a property interest" (Italics added). *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). But due process is not "a technical conception" of "inflexible procedures," *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961), nor is it a "mechanical instrument" or "yardstick"; it is rather "a delicate process of adjustment" and of a balancing of interests in which it is recognized "that what is unfair in one situation may be fair in another," *Anti-Fascist Committee v. McGrath*, 341 U.S. 123, 162–63, 71 S.Ct. 624, 643–44, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). It follows that there are situations where some form of a pre-deprivation hearing is required and others where a pre-deprivation hearing is unnecessary. This was made clear in *Parratt v. Taylor*, 451 U.S. 527, 540, 101 S.Ct. 1908, 1915, 68 L.Ed.2d 420 (1981), in which the Supreme Court said: "Our past cases mandate that some kind of hearing is required at some time before a State finally deprives a person of his property interests. The fundamental requirement of due process is the opportunity to be heard and it is an 'opportunity which must be granted at a meaningful time and in a meaningful manner,' ... However, as many of the above cases recognize, we have rejected the proposition that 'at a meaningful time and in a meaningful manner' *always* requires the State to provide a hearing prior to the initial deprivation of property." (Italics Court's) Actually, as the Supreme Court emphasized in *Mathews v. Eldridge*, 424 U.S. at 333, 96 S.Ct. at 902, and reiterated recently in *Cleveland Bd. of Education v. Loudermill*, —— U.S. ——, ——, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494, 506 (1984), *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), is the only case in which the Supreme Court has absolutely

"required a full adversarial hearing prior to adverse governmental action."

*Mathews v. Eldridge* is probably the definitive authority in this context. In that case the issue was "whether the Due Process Clause of the Fifth Amendment requires that prior to the termination of Social Security disability benefit payments the recipient be afforded an opportunity for an evidentiary hearing." The Supreme Court found that due process did not require such a hearing in that case. In reaching that conclusion, the Court identified generally the factors to be considered in determining whether a pre-deprivation hearing was required. These were:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[6]

The Court then proceeded to outline the procedure followed in terminating disability benefits under the procedures of the Department in that case. On the basis of information furnished by the recipient, the Department made a "tentative" determination that benefits may be terminated. The recipient was given notice of such termination and was given the right to "respond in writing and submit additional evidence" —but no hearing. *Id.* 424 U.S. at 337–38, 96 S.Ct. at 904. The Department thereafter made its determination, after review of the response, and advised him of its decision in writing and of his right to administrative review. Two months after the decision, benefits were to be terminated. *Id.* at 338, 96 S.Ct. at 904. From the termination the recipient was entitled to a full administrative hearing, followed by judicial review. *Id.* at 339, 96 S.Ct. at 904. This procedure was found to accord the recipient due process. In reaching this re-

---

6. 424 U.S. at 335, 96 S.Ct. at 903.

sult, the Supreme Court made this statement with respect to the recipient's interests:

> Since a recipient whose benefits are terminated is awarded full retroactive relief if he ultimately prevails, his sole interest is in the uninterrupted receipt of this source of income pending final administrative decision on his claim.

*Id.* at 340, 96 S.Ct. at 905.

While this possible delay entailed by the administrative process was recognized to be "an important factor in assessing the impact of official action on the private interests," there was not, in the Court's view, the "financial need" perceived by the Court in the *Goldberg* case present in that case and, though there could be a delay of as much as a year "between the actual cutoff of benefits and final [administrative] decision," the Court found that, under the circumstances, "there is less reason here than in *Goldberg* to depart from the ordinary principle, established by our decisions, that something less than an evidentiary hearing is sufficient prior to adverse administrative action."

The Court recognized in *Mathews* "the administrative burden and other societal costs that would be associated with requiring, as a matter of constitutional right, an evidentiary hearing upon demand in all cases prior to the termination of disability benefits." It concluded "that an evidentiary hearing is not required prior to the termination of disability benefits, before the denial of his claim becomes final," *Id.* at 347, 349, 96 S.Ct. at 908, 909, the Court saying:

> The judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decision-making in all circumstances. The essence of due process is the requirement that "a person in jeopardy of services loss [be given] notice of the case against him and opportunity to meet it." ... In assessing what process is due in this

case, substantial weight must be given to the good faith judgment of the individuals charged by Congress with the administration of social welfare programs that the procedures they have provided assure fair consideration of the entitlement claims of individuals.... This is especially so where, as here, the prescribed procedures not only provide the claimant with an effective process for asserting his claim prior to any administrative action, but also assures a right to an evidentiary review, before the denial of his claim becomes final.

424 U.S. at 348–49, 96 S.Ct. at 909.

Finally, the Court in *Mathews*, in distinguishing *Goldberg*, declared that "[t]he crucial factor in this context—[the requirement of a full hearing] a factor not present in the case of ... virtually anyone else whose governmental entitlements are ended—is that termination of aid pending resolution of a controversy over eligibility [might] deprive an *eligible* recipient of the very means by which to live while he waits" quoting *Goldberg*, 397 U.S. at 264, 90 S.Ct. at 1018 (Italics in original).[7] It found no such showing in that case.

In *Parratt v. Taylor*, 451 U.S. 527, 539–40, 101 S.Ct. 1908, 1914–15, 68 L.Ed.2d 420 (1981), the Supreme Court, after reviewing the authorities on the requirement of a pre-deprivation hearing under due process, said:

> These cases recognize that either the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking can satisfy the requirements of procedural due process. As we stated in *Mitchell v. W.T. Grant Co.*, 416 U.S. 600 [94 S.Ct. 1895, 40 L.Ed.2d 406] (1974):
>
> > "Petitioner asserts that his right to a hearing before his possession is in any

---

7. This language was said in *Mathews* to emphasize as the basis of the decision in *Goldberg* "that welfare assistance is given to persons on

the very margin of subsistence." 424 U.S. at 340, 96 S.Ct. at 905.

way disturbed is nonetheless mandated by a long line of cases in this Court, culminating in *Sniadach v. Family Finance Corp.*, 395 U.S. 337 [89 S.Ct. 1820, 23 L.Ed.2d 349] (1969), and *Fuentes v. Shevin*, 407 U.S. 67 [92 S.Ct. 1983, 32 L.Ed.2d 556] (1972). The pre-*Sniadach* cases are said by petitioner to hold that 'the opportunity to be heard must precede any actual deprivation of private property.' Their import, however, is not so clear as petitioner would have it; they merely stand for the proposition that a hearing must be had before one is finally deprived of his property and do not deal at all with the need for a pretermination hearing where a full and immediate post-termination hearing is provided. The usual rule has been '[w]here only property rights are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for ultimate judicial determination of liability is adequate.' *Phillips v. Commissioner*, 283 U.S. 589, 596–597 [51 S.Ct. 608, 75 L.Ed. 1289]." *Id.* at 611, 94 S.Ct. at 1902 (footnote omitted).

Particularly is it unnecessary to provide a party with a pre-deprivation administrative hearing, if there is some informal procedure, such as an opportunity to complain, available before deprivation, though an actual hearing is delayed until after termination. The recent case of *Cleveland Bd. of Education v. Loudermill*, —— U.S. ——, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1984), is illustrative of this principle. In that case, a public school employee whose services under State law could be terminated only for cause, claimed he was discharged without any pre-discharge hearing. The Supreme Court held that, while the employee was entitled to a pre-termination review the extent and formalities of such a "hearing" depended on "the importance of the interests involved and the nature of the subsequent proceedings." It concluded "that all the process that is due is provided by a

preterminatiON opportunity to respond, *coupled with post-termination administrative proceedings as provided by the Ohio statute,*" —— U.S. at ——, 105 S.Ct. at 1496, 84 L.Ed.2d at 507, leaving to a post-termination hearing the final administrative determination of the validity of his discharge (Italics added).

Applying the principles established in the foregoing authorities, we are of opinion that the procedure mandated in this context by the State statute and regulations meets the requirements of due process. Under this procedure, it is only after the agency has determined that a parent is in arrears more than 60 days in the payment of child support that such parent's name is prepared for certification to the Comptroller. When that determination to certify is made, the obligated parent is notified of the proposed action and is afforded a right to dispute the certification by requesting an investigation by the agency for the correctness of the arrearage. As we have seen, the administration must, on receipt of such request, "conduct an investigation of the reported arrearage" and, if it finds error, it shall "correct the amount of the reported arrearage or withdraw the certification." Under the State regulations, this investigation must be given the obligated parent "within 30 days from the date that the complaint was received." This procedure clearly provides the parent with as much of a pre-deprivation "hearing" as was given the recipient in *Mathews* or the employee in *Loudermill*. After the intercept, the obligated parent is entitled to a full administrative hearing, with the panoply of rights attaching to such a hearing, and should he be dissatisfied with the administrative decision he is entitled to a judicial review. And it is interesting that his right to a prompt hearing—something the claimant did not have in *Mathews*—is assured by the requirement that, if he requests an administrative hearing the hearing must be held and concluded within 60 days after he has demanded an administrative hearing.[8]

---

8. The hearing officer at the administrative hear-

ing must make "a written summary of findings

The temporary deprivation suffered by the obligated parents under this procedure is far less than that of the claimant in *Goldberg,* where the claimant, as the Court emphasized in *Mathews,* was living "on the very margin of subsistence" and the delay deprived that party "of the very means by which to live while he waits." 424 U.S. at 340, 96 S.Ct. at 905. In *Mathews* itself, the Court referred to the fact that "[e]ligibility for disability benefits [in that case], in contrast [to welfare assistance benefits in *Goldberg* ] is not based upon financial need", since the claimant might have other sources of support. Indeed, the defendant in that case offered statistics that indicated that in 1965 "the mean income of the family unit of a disabled worker was $3,803, while the median income for the unit was $2,806." 424 U.S. at 342, n. 26, 96 S.Ct. at 906 n. 26. This was stated as a basis for denying a constitutional requirement of a pre-termination hearing in that case.

The obligated parents in this case are not persons "on the very margin of subsistence" as in *Goldberg,* nor are their incomes to be likened to those of the recipients of disability benefits in *Mathews,* even if the inflation since 1965 is taken into consideration. The record contains three of the plaintiffs' income tax returns. It seems safe to assume these returns reflect generally the income tax status of the plaintiffs, all of whom appear to have been employed by the same employer in roughly the same work. These three plaintiffs all had incomes of more than $30,000 per year, or, if we assume they worked 50 weeks in a year, a little over $600 a week. Under these circumstances and "[i]n view of these sources of ... income, there is [far] less reason here than in *Goldberg* to. depart from the ordinary principle established by our decisions, that something less than an evidentiary hearing is sufficient prior to adverse administrative action." *See Mathews,* 424 U.S. at 343, 96 S.Ct. at 907. This is especially true, if we give any regard to the public policy involved, as expressed in both the federal and state legislation, of the probable dire need of the dependent children in those cases where no ADFC benefits are being received, and the extreme effort taken by the State both in its statute and in its regulations to minimize any possible prejudice to the obligated parent without, of course, diminishing unfairly the rights of the dependent children.

■ It is the plaintiffs' argument, though, that the burden of delay could be moderated, if not eliminated, if the State would provide a full administrative hearing to the certified parent immediately after the certification but before any intercept is made and even before it has been ascertained whether a tax refund is due. This argument was accepted by the district court; in fact, it appears to be the main buttress to its conclusion that a pre-intercept administrative hearing was required by due process. The district court said that the proposed pre-termination hearing under such circumstances "would be neither impractical nor overly costly." It bases this conclusion on this reasoning (600 F.Supp. at 567):

> The state of Maryland already provides a post-deprivation hearing process which, if done earlier, would satisfy all requirements of due process. The additional cost of holding that same hearing earlier is minimal. The state may also gain in efficiency what it may lose in monetary terms. As plaintiffs point out, the earlier determination will allow the funds to be distributed to child support payees at an earlier date. Under the current system, an administrative appeal stays the distribution of intercepted refunds to the obligees. Requiring a pre-deprivation hearing will not impair the government's function in collecting child support payments.

The reasoning of the district court overlooks the actual working of the Maryland

and conclusions based exclusively on the record" and "shall notify the parties in writing of the decision on the appeal within 60 days of the receipt of the appeal." This procedure pro-

vides effective protection against the "torpidity" in administrative decisions which was asserted as a criticism of the procedure in *Mathews.*

intercept procedures. That court assumes that it is no less impractical and no less burdensome to provide a full pre-intercept administrative hearing than it is to grant the post-intercept administrative hearing. In making this assumption the court assumes the state could hold its hearing immediately after it certifies its list of delinquent fathers to the Comptroller. The problem with this reasoning, however, is that it is only to those among the certified parents, whose names had been certified to the Comptroller and *who had been found to be due refunds,* that the state is obligated, on request, to afford an administrative hearing. It can be presumed that many of those certified will not be entitled to a refund and consequently would not be entitled to a hearing. Actually, it was suggested that only a third of those certified to the Comptroller qualified for refunds. It may be presumed that not all those so entitled would object to the intercepts.

If, however, the procedure were revised to require the certified parent to request and have a hearing on his delinquency even before he knows whether he is entitled to a refund or whether he intends to object if it proves he is entitled to a refund, the State would be forced to offer hearings and, in many cases presumably, to hold hearings even though it would later be found that no refund was due the particular parent. Such a procedure would represent an intolerable and unnecessary burden on the State, a factor said to be of great importance in this connection, under the standards stated in *Mathews.*[9] In addition, the State procedure offers considerable protection to the delinquent parent by the procedures given him under the statutes and regulations to request a preliminary investigation of the correctness of his certification as a delinquent parent. It has been well said that the procedural protection mandated by due process "is adequate if it represents a fair accommodation of the respective interests" concerned. *Finberg v. Sullivan,* 634 F.2d 50, 58 (3d Cir.1980).

The plaintiffs, however, point out that two of the plaintiffs had their certifications withdrawn after investigation. They cite this as evidence that the certification itself, based as it is on a computer operation, is not reliable. We are unwilling, as was the Supreme Court in *Mathews,* to find a procedure inadequate on such a flimsy showing. More important is the fact that after the two plaintiffs disputed the basis for the certifications and the agency made its pre-intercept investigation, the certifications were withdrawn. This fact attests to the reliability and the efficiency of the investigatory procedure and is clear evidence that adequate due process is provided the obligors.

In any event, we are of the opinion the State appears to have made a good faith effort by its procedure to reduce any deprivation of the parent to a minimum with due regard to the difficulty of the problem itself and its procedure "represents a fair accommodation of the respective interests" concerned in the intercept program. In reaching this conclusion, we recognize that there are cases contrary to the result reached by us. In general, these cases were reviewing statutes and facts different in significant respects from those with which we are concerned. In *Nelson v. Regan,* 560 F.Supp. 1101 (D.Conn.1983), *aff'd. on other grounds,* 731 F.2d 105 (2d Cir.1984), under the required notice the defaulting parents were "not told the claimed amount of their obligations [to their dependent children] or the fact that their names had already been certified to the IRS.... authority to delete names from the list certified to the IRS" was, if existent, of limited value, and after the intercept of the tax refund, "[n]o provisions were made for regular procedures in which to challenge the State's claim to a refund." *Id.* at 1106. In *Marcello v. Regan,* 574 F.Supp. 586, 598 (D.R.I.1983), the Court seems to be declaring that a hearing must be had after the determination that a refund is due but "prior to the time the refundable amount would ordinarily be in

---

**9.** 424 U.S. at 347, 96 S.Ct. at 908.

order for disbursement." The Maryland procedure substantially does this. Actually, what both of these cases in effect declare is that there must be a hearing before the tax refund is transferred to one other than the taxpayer. This is the construction given *Marcello* and *Nelson* in *Presley v. Regan,* 604 F.Supp. 609, 613 (N.D.N.Y. 1985). In that case, the Court summarized the rulings in the cases dealing with the intercept procedures thus:

> Two courts have held that due process requires the states to provide a pre-transfer hearing. *Nelson,* 560 F.Supp. at 1111; *Marcello,* 574 F.Supp. at 599, and two courts have held that no hearing is constitutionally required before transfer of an obligated parent's refund. *Jahn v. Regan,* 584 F.Supp. 399 (E.D.Mich.1984); *Kenney v. Secretary of the Treasury,* No. 83–2427, slip op. (C.D.Cal. Oct. 11, 1983).[10]

In any event, we are satisfied the Maryland procedure is fair and does not offend the parents' due process rights.

This cause is accordingly remanded to the district court for the entry of a decree in conformity with this decision.

REVERSED and REMANDED.

---

**10.** To the same effect as *Jahn* and *Kenney* is the decision without opinion of the Third Circuit in *Hudson v. Tweed,* affirming the district court's decision, 749 F.2d 26 (3d Cir.1984).