William and Linda KNISLEY, Horace and Julia Johnson, Clara Daniels and Sandra Thrasher, on Behalf of themselves and all others similarly situated, Plaintiffs,

v.

Robert BOWMAN, Director of the Michigan Department of Treasury, Defendant.

No. K82–4.

United States District Court, W.D. Michigan, S.D.

April 13, 1987.

Michigan Legal Services by Edward J. Hoort, Flint, Mich., Legal Services of Southwestern Michigan by William L. Coash, Battle Creek, Mich., for plaintiffs.

Frank J. Kelley, Atty. Gen. by John W. Jackson, Jr., Richard R. Roesch, Asst. Attys. Gen., Lansing, Mich., for defendant.

OPINION

ENSLEN, District Judge.

This action was originally brought to enjoin defendant from "absconding with income tax refunds of individuals without providing rudimentary due process." Essentially, plaintiffs challenge the State of Michigan's state tax refund intercept program, whereby the Michigan Department of Treasury (MDT) acts as a collection agent for all state agencies with monetary claims against individuals who file state

income tax returns. Some time ago the court denied defendant's motion to dismiss plaintiffs' complaint pursuant to Fed.R. Civ.P. 12(b)(6). *Knisley v. Monroe*, 539 F.Supp. 849 (W.D.Mich.1982). Currently pending before the Court are plaintiffs' motion for class certification and cross motions for summary judgment.

## I. FACTUAL BACKGROUND

The six named plaintiffs, two married couples and two individuals, were all adversely affected by the defendant's implementation of the tax intercept program in 1981.

While plaintiffs have only brought suit against the MDT and its Director, the state tax intercept program is essentially a cooperative effort in which MDT acts on behalf of other state agencies. Any state agency with an outstanding liquidated debt against a state taxpayer may, by following the appropriate procedures, have the MDT offset, by the amount of the debt, any state tax refund claimed by the debtor. There are, of course, numerous state agencies that refer debts to the MDT for participation in the tax intercept program. The nature of the debts owing to these different agencies for which claims are made to the MDT are even more varied. In the cases of the Michigan Employment Security Commission and the Michigan Vehicle Accident Claims Fund, the debts referred to the tax intercept program arise from administrative decisions or judicial judgments. The Department of Education, Central Michigan and Northern Michigan Universities often use the program to collect on promissory notes (student loans) on which the obligor has defaulted. Referrals to the MDT from the Department of Social Services (DSS) originate from at least seven different agency programs: (1) General Assistance, (2) Emergency Needs Program, (3) Aid to Families with Dependent Children, (4) Medical Assistance, (5) Food Stamp Program, (6) Court-Ordered Foster Care, and (7) Court-Ordered Child Support. The claims of all the named plaintiffs related to alleged obligations to one state agency—the DSS.

Plaintiff William Knisley was twice adjudged in contempt of the Calhoun County Circuit Court's order for child support: on June 11, 1975 for the amount of $1,180.00 and on March 21, 1977 for the amount of $3,752.50. On February 2, 1979, Mr. Knisley acknowledged the increasing arrearage and agreed to an increasing adjudgment in his child support payments. On June 19, 1980, Mr. Knisley agreed to an increased wage assignment.

In the State of Michigan, the Office of the Friend of the Court (FOC) acts as an intermediary between the individual ordered to pay child support and the recipient of the support. All payments of child support are received initially by the FOC. M.C.L.A. § 552.509 (replacing former M.C.L.A. § 552.252).[1] Where, as in the Knisley case, the children receive public assistance under the Aid to Families with Dependent Children (AFDC) program, the State is assigned the rights to all back child support accrued at the time of application for assistance. 42 U.S.C. § 602(a)(26)(A).[2] In

---

[1] 1982 Mich.Pub. Acts No. 294, § 9, (codified at M.C.L.A. § 552.509), which became effective July 1, 1983, provides in pertinent part:

(1) After a support order is entered in a domestic relations matter except as otherwise provided in the order or judgment, the office [of the Friend of the Court] shall receive all payments of support orders and service fees; not less than once each month report the support payments due, paid, and past due; and disburse all support receipts to the recipient of support.

[2] The AFDC program is a cooperative federal/state undertaking, administered by the state, in which the federal government provides matching funds to the state to provide protection to children in homes without "breadwin-

ners." *King v. Smith*, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); *see* 42 U.S.C. § 601 *et seq*. A state's participation in the AFDC program is conditioned upon the preparation of a written plan for administration of the program which complies with numerous federal requirements. The state plan must also be approved by the Secretary of the Department of Health and Human Services. 42 U.S.C. § 602. One particular requirement is set forth at 42 U.S.C. § 602(a)(26)(A), as amended, which provides:

A State plan for aid and services to needy families with children must—

. . . .

(26) provide that, as a condition of eligibility for aid, each applicant or recipient will be required—

that case, child support payments received by the FOC are transferred directly to the DSS. M.C.L.A. § 552.23(2).[3]

At some point in 1981, Mr. Knisley was certified by the FOC for a state tax refund offset. Mr. Knisley and his second wife, Linda, filed a joint state income tax return for the tax year 1980. Linda Knisley had no legal responsibility for her husband's child support obligations. Nevertheless, $349.46 of the Knisleys' joint tax refund for 1980 was intercepted by the MDT and transferred to the DSS on April 1, 1981.

Plaintiff Horace Johnson is or was subject to three separate orders of child support from the Calhoun County Circuit Court. He has been found in contempt of court for arrearages on these obligations numerous times between 1978 and 1981. Horace and Julia Johnson filed a joint state income tax return and for the tax year 1980. Once again, due to child support arrearages and AFDC reimbursement obligations, $172.62 of Johnson's state tax refund for 1980 was intercepted by MDT and transferred to DSS. Subsequent to the interception and transfer of funds, it was determined by DSS that Julia Johnson was a non-indebted spouse having earned 23% of the family's joint income reported on the 1980 tax return. Therefore, Julia Johnson received an administrative refund of 23% of the intercepted amount, or $39.70.

Plaintiff Clara Daniels twice executed agreements to repay the Calhoun County DSS amounts received from that office. On April 28, 1975, Ms. Daniels agreed to repay $144.70 received for payment of "delinquent taxes." On May 18, 1978, Ms. Daniels signed an agreement that emergency relief in the amount of $74.00 received from the office would be repaid out of her "property tax rebate check." On August 25, 1977, the local DSS office sent a letter to Ms. Daniels demanding repayment of the delinquent balance of $92.00 on the original 1975 amount. On June 30, 1980, the local DSS sent another letter demanding repayment of the $74.00 debt acknowledged in 1978. This letter, however, evidences that the 1978 agreement to repay was not a separate debt in addition to the amount owed on the 1975 aid. Rather, the $74.00 balance referred to in the 1978 agreement was merely the remaining balance on the 1975 debt. Nevertheless, DSS referred the matter to MDT, which intercepted and transferred to DSS $205.00 of Ms. Daniels' homestead property tax credit for 1980. On July 13, 1981, DSS issued a $39.00 administrative refund to Ms. Daniels, stating that by the department's calculations, that much of the debt had been paid. It appears to this Court that the DSS erroneously added the $92.00 balance from the 1975 aid and the $74.00 balance on the "1978 aid" to arrive at a "total balance" of $166.00. Of course, the Department's own letter of June 30, 1980, reveals that this computation is plainly in error. The Court is unaware whether Ms. Daniels has ever been made whole for this erroneous deprivation.

On February 3, 1978, Plaintiff Sandra Thrasher (a/k/a Sandra Wilcox) signed an agreement to repay the Calhoun County DSS an amount of $523.60 received for emergency relief. According to the agreement, this amount was to be repaid by March 31, 1978. Although Ms. Thrasher was sent letters demanding repayment in July and October of 1980, it appears that no effort to repay the amount was ever made. The MDT intercepted her 1980 income tax refund and homestead property tax credit and transferred the full amount, $521.00, to DSS.

(A) to assign the State any rights to support from any other person such applicant may have (i) in his own behalf or in behalf of any other family member for whom the applicant is applying for or receiving aid, and (ii) which have accrued at the time such assignment is executed....

**3.** Section 552.23(2), as amended, provides:

(2) Upon certification by a county department of social services that a complainant or petitioner in a proceeding under this chapter is receiving public assistance either personally or for children of the marriage, payments received by the friend of the court for the support and education of such children or maintenance of the party shall be transmitted to the state department of social services. Once an assignment is made as required by 42 U.S.C. § 602(a)(26)(A), federal law considers the accrued support an obligation owed directly to the state. 42 U.S.C. § 656(a).

## II. PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

■ Plaintiffs have moved pursuant to Fed.R.Civ.P. 23(a) and (b)(2) to have the following class certified: "all those persons who have had income tax refunds withheld by the Defendants [MDT and its Director] without notice and the opportunity for a hearing and all those persons who may have income tax refunds so withheld by Defendant[s] in the future." Rule 23 provides, in pertinent part:

(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) Class Actions Maintainable. *An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied and, in addition:*

. . . .

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole [emphasis added].

The parties dispute the plaintiffs' ability to meet the four prerequisites of (a) with respect to their proposed class. For the reasons set forth in the following discussion, the Court believes that plaintiffs can only make the required showings of (a) and (b)(2) with respect to a class more discrete than that proposed. A more appropriate class is defined as all those persons who have in the past been aggrieved by defendants' interception of state income tax refunds pursuant to a referral from the DSS, and those persons who will be so aggrieved in the future.

With respect to either the plaintiffs' proposed class or the more discrete class suggested by the Court, the numerosity requirement of Rule 23(a)(1) would be satisfied. While the Court has no exact figures before it, it appears from the information obtained in discovery that the number of people aggrieved by DSS-related tax refund interceptions since the program began is most certainly in the hundreds and possible thousands. The Court will take judicial notice of the fact that the number of plaintiffs in the smaller class is substantial enough to make joinder "impracticable."

The prerequisites of (a)(2)–(4) are not so easily satisfied or even analyzed *vis-a-vis* the plaintiffs' proposed class and the Court's suggested class. For one thing, these three requirements seem to overlap somewhat and a less than careful application of the rule to the facts of a particular case can easily spell error. *See generally* 3B J. Moore & J. Kennedy, *Moore's Federal Practice* ¶ 23.06–2, at 23–191 to –192 (2d ed. 1985). Subparagraph (a)(2) requires that there be "questions of law or fact common to the class." This commonality requirement does not necessitate that *all* claims of law or questions of fact raised by the class members be in common. *Vulcan Society v. Fire Department*, 82 F.R.D. 379 (S.D.N.Y.1979). It is enough in the instant case that class members raise a common issue of law: does the defendant's tax intercept program afford class members adequate due process protections? *See Marcera v. Chinlund*, 595 F.2d 1231 (2d Cir. 1979). Moreover, this legal issue is common to the class members of both plaintiffs' proposed class and the class suggested by the Court.

The next requirement, found in (a)(3) is typicality. The claims of the representative or named plaintiffs must be typical of, or have the essential characteristics common to, the claims of the class. As the Court has already set forth, all of the named plaintiffs were aggrieved by actions of the defendant on DSS-related obligations. Since the MDT operates the tax refund intercept program for *all* state agencies, and as set forth more fully below, the responsibility for affording due process protections to the aggrieved taxpayer is shared by the MDT and the referral agency, it cannot be said that the essential

characteristics of the named plaintiffs' claims are typical of the claims of the members of the plaintiffs' proposed class. Plaintiffs have made no showing that a person whose tax refund is intercepted by the MDT to satisfy an alleged obligation to the DSS is in essentially the same position as a person whose tax refund is intercepted and transferred to the Michigan Vehicle Accident Claims Fund (pursuant to a court judgment) or to Northern Michigan University (to satisfy a student loan). However, if the class is limited to that proposed by the Court, encompassing only those persons aggrieved by DSS-related referrals, then the claims of the named representatives are typical of those of the class.

The final requirement of paragraph (a) of Rule 23 is that the named plaintiffs must fairly and adequately represent the interests of the class. It should be noted at the outset that plaintiffs enjoy the good fortune of being represented by most competent legal counsel. Therefore, the adequacy of their counsel is not in contention. *See Eisen v. Carlisle and Jacquelin,* 391 F.2d 555, 562 (2d Cir.1968). As to the named representatives themselves, it appears that there is a complete absence of any antagonistic interests. In fact, the Court has only one reservation to pronouncing that the representatives' interests are coextensive with the other members of the plaintiffs' proposed class. That reservation is the finding under (a)(3) that the named plaintiffs' claims are not typical of the claims of the larger class. In response to the Court's second order requiring the defendant to supply copies of notices and procedures used by all state departments and agencies when collecting debts through the MDT, defendant submitted twenty-six (26) exhibits representing twenty-one (21) different departments and agencies. Reviewing those documents convinces the Court that plaintiffs' claims are not typical of the claims of the larger class. However, because typicality is not a concern with respect to the more discrete class suggested by the Court, I also find that the representatives' interests are coextensive with the interests of that limited class. Therefore, the (a)(4) requirement of adequacy of representation is met with respect to the DSS-related class.

Turning finally to the requirement of Rule 23(b)(2), it is very clear that plaintiffs' proposed class is inappropriate, but the DSS-related class suggested by the Court is appropriate. Subparagraph (b)(2) focuses on the conduct of the plaintiff class itself. The conduct of the defendant in this case cannot be viewed in isolation from the conduct of the referral agency. The very nature of the tax intercept program which plaintiffs challenge is that it is a cooperative effort. The referral agency plays a major role in providing due process protections to the affected taxpayers. Thus, for purposes of a due process inquiry, it cannot be said that the MDT acted or refused to act on grounds generally applicable to the plaintiffs' proposed class inasmuch as that class covers all state agency referrals and the procedural protections afforded may differ from agency to agency. However, if the class is limited to those taxpayers aggrieved by DSS-related setoffs, then the Court can be satisfied that the MDT's grounds for intercepting tax refunds are generally applicable to the entire class.

In conclusion, the Court finds that plaintiffs' proposed class is inappropriate for certification because it does not meet the prerequisites of Rule 23(a)(3), (4) and (b)(2). On the other hand, a smaller class of plaintiffs defined as those persons who have in the past been aggrieved by defendant's interception of state income tax refunds pursuant to a referral from the DSS, and those persons who will be so aggrieved in the future, does satisfy (a)(1)–(4) and (b)(2) and should be certified. Therefore, plaintiffs' motion for certification of class, as modified, is granted. The Court now turns its attention to the merits of the cross motions for summary judgment.

### III. MICHIGAN'S TAX INTERCEPT PROGRAM

The tax intercept program administered by the MDT is a debt collection program initiated in 1981 and first applied to 1980 tax year refunds. The parties disagree over whether the MDT had the authority, statutory or otherwise, to implement such a program. Plaintiffs maintain that due to

the nature of the tax intercept program, it required specific and express statutory authority. Plaintiffs point to the federal government's tax intercept program as an example of a *statutorily authorized* interception that does not violate due process.

Defendant argues that the state tax intercept program was authorized by a "weave" of specific statutory authority and common law principles. This weave was first outlined, at the request of the DSS, in 1980 Op.Mich.Att'y Gen No. 5794, at 1028. The following discussion describes the operation of the program and the former statutory justification for it, its "warp and woof," at least as it related to obligations owing to the DSS.

## A. *Pre–1986*

This opinion has already briefly discussed the origin of the debt to the DSS in AFDC-related, past-due child support cases. When a household applies for AFDC, all past-due child support is assigned to the DSS. 42 U.S.C. § 602(a)(26)(A).[4] Thereafter, when support payments are made to the FOC they are

---

4. Congress, in the Omnibus Reconciliation Act of 1981, Pub.L. No. 97–35, Title XXIII, § 2331(a), 95 Stat. 860 (1981) (codified at 42 U.S.C. § 664), specifically authorized the interception of federal tax refunds for the collection of past-due support which has been assigned to the state pursuant to § 602(a)(26), *supra* note 2, and for the transferral of such intercepted funds to the appropriate state agency. In the Child Support Enforcement Amendments of 1984, Pub.L. 98–378, § 21(a), (g), 98 Stat. 1305, 1322 (1984), Congress amended § 664 to provide for increased procedural protections for taxpayers whose federal refunds were being intercepted. Because a congressional determination of what process is due in a similar and interrelated tax intercept program is relevant to one of the issues before this Court—what procedural protections are required in the state tax intercept program—the relevant portions of the amended § 664 are quoted at length:

(a)(1) Upon receiving notice from a State agency administering a plan approved under this part that a named individual owes past-due support that has been assigned to such State pursuant to section 602(a)(26) ... of this title, the Secretary of the Treasury shall determine whether any amounts, as refunds of Federal taxes paid, are payable to such individual (regardless of whether such individual filed a tax return as a married or unmarried individual). If the Secretary of the Treasury finds that any such amount is payable, he shall withhold from such refunds an amount equal to the past-due support, and pay such amount to the State agency (together with notice of the individual's home address) for distribution in accordance with section 657(b)(4) ... of this title.

(2)(A) Upon receiving notice from a State agency administering a plan approved under this part that a named individual owes past-due support ... which such State has agreed to collect under section 654(6) of this title, and that the State agency has sent notice to such individual in accordance with paragraph (3)(A), the Secretary of the Treasury shall determine whether any amounts, as refunds of Federal taxes paid, are payable to such individual (regardless of whether such indi-

vidual filed a tax return as a married or unmarried individual). If the Secretary of the Treasury finds that any such amount is payable, he shall withhold from such refunds an amount equal to such past-due support, and shall concurrently send notice to such individual that the withholding has been made, including in or with such notice a notification to any other person who may have filed a joint return with such individual of the steps which such other person may take in order to secure his or her proper share of the refund. The Secretary of the Treasury shall pay the amount withheld to the State agency, and the State shall pay to the Secretary of the Treasury any fee imposed by the Secretary of the Treasury to cover the costs of the withholding and any required notification. The State shall, subject to (3)(B), distribute such amount to or on behalf of the child to whom the support was owed.

(B) This paragraph shall apply only with respect to refunds payable under section 6402 of title 26 after December 31, 1985, and before January 1, 1991.

(3)(A) Prior to notifying the Secretary of the Treasury under paragraph (1) or (2) that an individual owes past-due support, the State shall send notice to such individual that a withholding will be made from any refund otherwise payable to such individual. The notice shall also (i) instruct the individual owing the past-due support of the steps which may be taken to contest the State's determination that past-due support is owed or the amount of the past-due support, and (ii) provide information, as may be prescribed by the Secretary of Health and Human Services by regulation in consultation with the Secretary of the Treasury, with respect to procedures to be followed, in the case of a joint return, to protect the share of the refund which may be payable to another person.

(B) If the Secretary of the Treasury determines that an amount should be withheld under paragraph (1) or (2), and that the refund from which it is withheld is based upon a joint return, the Secretary of the Treasury shall notify the State that the withholding is being made from a refund based upon a joint

transferred to the DSS rather than to the custodian of the child. M.C.L.A. § 552.-512(2). In the past-due child support situation, the debt derives from a judgment of a state circuit court. Arrearages in payment of court-ordered support result in either formal contempt proceedings before the Court or signed acknowledgements of the arrearage by the noncustodial parent. If that parent is working, a wage assignment may be implemented. If the FOC is unable to collect the past-due child support owing to the state, it certifies the matter to the DSS for further action.

NonAFDC-related obligations to the DSS, such as those arising from the Emergency Needs Program, are more directly evidenced. As in the cases of plaintiffs Daniels and Thrasher, the individual executes a form declaration and agreement to repay which sets forth the amount owing, the terms of repayment and the reason for the temporary relief. The form is then signed and dated by the recipient of the

> return, and shall furnish to the State the names and addresses of each taxpayer filing such joint return. In the case of a withholding under paragraph (2), the State may delay the distribution of the amount withheld until the State has been notified by the Secretary of the Treasury that the other person filing the joint return has received his or her proper share of the refund, but such delay may not exceed six months.
>
> (C) If the other person filing the joint return with the named individual owing the past-due support takes appropriate action to secure his or her proper share of a refund from which a withholding was made under paragraph (1) or (2), the Secretary of the Treasury shall pay such share to such other person. The Secretary of the Treasury shall deduct the amount of such payment from amounts subsequently payable to the State agency to which the amount originally withheld from such refund was paid.
>
> (D) In any case in which an amount was withheld under paragraph (1) or (2) and paid to a State, and the State subsequently determines that the amount certified as past-due support was in excess of the amount actually owed at the time the amount withheld is to be distributed to or on behalf of the child, the State shall pay the excess amount withheld to the named individual thought to have owed the past due support (or, in the case of amounts withheld on the basis of a joint return, jointly to the parties filing such joint return).

42 U.S.C. § 664.

relief and a representative of the DSS. If and when the obligated individual defaults on the agreed repayment schedule, reminder notices are sent to the recipient's last known address requesting that the recipient pay the balance immediately or contact the local DSS office to make alternative arrangements. It is the policy of the DSS not to certify debts of this type to the MDT for the tax intercept program unless informal attempts to settle the debt through the notice procedure have been unsuccessful.

If the debts are appropriate for the federal and state intercept programs,[5] the DSS certifies them to the appropriate governmental agency. The DSS is duty bound to forward to the MDT a list of delinquent accounts owing to the state. M.C.L.A. §§ 14.133, 205.13(h). The MDT is authorized to offset any state income tax refund to which an individual is otherwise due by the amount of the obligation owing to the state as certified by the DSS. M.C.L.A. § 205.30.[6]

5. A past-due support obligation qualifies for the federal offset program if it satisfies the provisions of 45 C.F.R. § 303.72(a). The Court is unaware whether the state's standards for its own tax intercept program, if there are any, differ from the federal standards.

6. This section provides in pertinent part:
> (2) A taxpayer who paid a tax claimed not to be due, within the time period specified as the statute of limitations in the applicable taxing statute, may petition the department [of treasury] for refund of the amount paid. If a tax return reflects an overpayment or credits in excess of the tax, the declaration of that fact on the return constitutes a claim for refund. If the department agrees the claim is valid, the amount of overpayment, penalties, and interest *shall first be applied to any known liability and the excess, if any, shall be refunded to the taxpayer, or credited,* at taxpayer's request, against any current or subsequent tax liability.

M.C.L.A. § 205.30(2) (emphasis added).

In 1980, the Michigan Attorney General opined that the tax intercept program could also be said to be supported by statute insofar as the State Treasurer has the authority to settle the claims of all persons indebted to the state by drawing warrants on the state treasury. This opinion was based on M.C.L.A. § 12.41, which vested in the State Treasurer all the powers and duties as to warrants of the Auditor General, and the former M.C.L.A. § 13.18, which directed the Auditor General (State Treasurer) to draw war-

Defendant argues, and this Court agrees, that the MDT was authorized by statute to implement the tax intercept program. The fact that the terms of the program were not concisely set forth in any one specific statute, as is the federal counterpart and 42 U.S.C. § 664, is of little or no consequence. There is persuasive authority for the proposition that a governmental body has the same common law right as any other creditor "to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him." *United States v. Munsey Trust Co.*, 332 U.S. 234, 239, 67 S.Ct. 1599, 1602, 91 L.Ed. 2022 (1947) (quoting *Gratiot v. United States*, 40 U.S. (15 Pet.) 336, 370, 10 L.Ed. 759 (1841)). *See also Brown v. Lobdell*, 36 Or.App. 397, 585 P.2d 4, 7 (1978).

Apart from the legitimacy of the MDT's actions in intercepting state tax refunds and applying the money to the taxpayer's alleged obligations to the state, is the issue of the procedural protections afforded the affected taxpayers by the state. Assuming the truth of plaintiffs' allegations, at least in 1981 when the program was in its formative states, these procedural safeguards were poorly defined and haphazard. However, in the years that followed it appears that the program's due process protections began to take shape.

Apparently one catalyst for change was a consent judgment entered by Judge Gilmore on March 29, 1984 in the case of *Jones v. Ritsema*, No. 82–73574 (E.D. Mich.). The plaintiffs in *Jones* challenged the federal tax intercept program authorized by 42 U.S.C. § 664 and 26 U.S.C. § 6402 on the grounds that it failed to afford adequate procedural protections.[7] Due to the nature of the federal program's goal of intercepting federal tax refunds of taxpayers who had past-due child support obligations that had been assigned to the state, the Director of the DSS and the Wayne County FOC were defendants in the suit.

The terms of the consent judgment were that the DSS would send out pre-offset notices to all Michigan residents whose names were to be certified to the Internal Revenue Services (IRS) for participation in the program. The pre-offset notice would inform the taxpayer that he or she could request a hearing to dispute the certification or the amount stated as past due. This informal hearing would be held before an employee of the FOC who had authority to amend the amount certified or delete the taxpayer's name from the certification list. The hearing officer's written decision would be rendered within ten days and could be appealed by the taxpayer to a referee and/or state circuit court. The pre-offset notice also contained a statement informing a nonobligated spouse of the right to receive his or her portion of the tax refund from the IRS in case of a joint return.

The consent decree in *Jones* also required the IRS to send the obligated spouse a post-offset notice informing him or her that the tax refund had been intercepted to satisfy the alleged past-due child support obligations. This notice also informed the obligated spouse to contact the DSS with any questions. Lastly, the post-offset notice informed nonobligated spouses that, in case of a joint return, they should claim their portion of the refund by filling out form "1040X" and returning it to the IRS. If the obligated spouse contacted the DSS and requested a hearing, one would be held before an employee of the FOC. The procedure and right of appeal from a decision of a post-offset hearing officer were very similar to that described under the pre-offset hearing.

As to the adequacy of the above-described procedural protections implemented in the federal tax intercept program pursuant to the *Jones* consent judgment, the Court notes that by signing that document, Judge Gilmore evidenced his opinion that they were constitutionally sufficient. The

---

rants on the treasury to settle claims. However, effective March 29, 1985, M.C.L.A. § 13.18 and various other provisions concerning the duties and powers of the Auditor General were repealed by the State Legislature.

7. *See supra* note 4. (Version of § 664 remanded after *Jones*).

constitutionality of these procedures was again recognized by Judge Pratt in *Jahn v. Regan*, 610 F.Supp. 1269, 1274–81 (E.D. Mich.1985) (*Jahn II*). Further, Congress's 1984 amendments of 42 U.S.C. § 664 provided a detailed codification of essentially similar procedures to be followed by all states participating in the federal tax intercept program.[8] Finally, although the *Jones* consent judgment applied only to the federal program, it appears that at some point the state began following the same procedures with respect to the state tax intercept program. *See* Affidavits of Rose Wilbur and Marc Rodgers & attachments.

### B. *Public Act 211 of 1985*

In 1985, the Michigan Legislature enacted Public Act 211, which amended M.C.L.A. § 205.30, and added a new section, 205.30a. This Act became effective January 8, 1986. Section 30 deals with state tax refunds generally. The new § 30a is entitled "Liabilities applied to refund amount; priorities." Essentially, § 30a is the long-awaited express statutory authorization for the MDT to operate the tax refund intercept programs. Subsections 30a(2) and (3) contain the language empowering the MDT to intercept state tax refunds in certain situations:

(2) The amount of a [state tax] refund described in subsection (1) shall be applied to the following in the order of priority stated:

(a) Any other known tax liability of the taxpayer to this state.

(b) Any other known liability of the taxpayer to this state, including a liability to pay support if the right to receive the support has been assigned to the state and the liability is the basis of a request for tax refund offset from the office of child support.

(c) The following in the order of priority received, unless otherwise provided by law:

(i) A support liability of the taxpayer that is the basis of a request for tax refund offset from the office of child support, other than as provided by subdivision (b).

(ii) A writ of garnishment or other valid court order issued by a court of competent jurisdiction and directed to this state or the state treasurer to satisfy a liability of the taxpayer.

(iii) A levy of the internal revenue service to satisfy a liability of the taxpayer.

(3) If the claim for refund is reflected on a joint tax return, the department [of treasury] shall allocate to each joint taxpayer his or her share of the refund. The amount allocated to each taxpayer shall be applied to his or her respective liabilities in the order of priority stated in subsection (2).

■ A hearing was held on April 8, 1986 to consider the effect of the intervening changes in both state and federal law on the pending cross motions for summary judgment. At this hearing, Public Act 211 was a major topic of discussion. Plaintiffs interpreted § 30a(2)(c)(ii) of the Act as modifying the entirety of paragraph (2) to the extent that the state could only offset tax refunds to satisfy debts evidenced by valid judgments of court orders. The Court is of the opinion that plaintiffs' interpretation of this Act is unduly restrictive and plainly in error.

It must be recognized that paragraph (2) states that the obligations described in (a), (b) and (c) are to be satisfied "in the order of priority stated," or in other words, in descending priority. The highest priority, (2)(a), is to be given to the taxpayer's outstanding *tax* liability to the State of Michigan. Second in priority, (2)(b), is [a]ny other known liability of the taxpayer to [the State of Michigan]." By the terms of subparagraph (b), this includes past due child support that has been assigned to the state pursuant to 42 U.S.C. §§ 602(a)(26)(A) and 656(a).

Subparagraph (2)(c) states that, "unless otherwise provided by law," MDT will prioritize the three listed types of obligations in the order in which it receives notice of them. None of the three subdivisions that follow describes obligations owing to the state. Debts to the state are prioritized in (2)(a) and (b). Therefore, the language of

8. *See supra* note 4.

(2)(c)(ii) in no way modifies or restricts the operation of (2)(b). Properly interpreted, subparagraph (2)(b) fully authorizes MDT to intercept state tax refunds to satisfy the full panoply of debts to the various agencies of the State of Michigan, including the type of debts referred for collection by the DSS.

Of course, § 30a(3) authorizes the MDT to offset state tax refunds claimed on a joint tax refund to satisfy the debt of an obligated spouse. The procedure for notifying the nonobligated spouse and determining that the allocation of the refund is described in paragraphs (4)–(6). It should be noted that the nonobligated spouse allocation form is sent out by the MDT, *not* the referral agency, after it has been determined that a refund is due. Failure of the nonobligated spouse to complete and return the allocation form to the MDT within thirty (30) days results in the MDT applying the full refund amount, if necessary, to satisfy the debt of the obligated spouse. *See* Affidavit of Suzanne Horn ¶¶ 12–13. This failure also results in a waiver by the nonobligated spouse of all claims against the state or the MDT regarding the intercepted refund. M.C.L.A. § 30a(8).

Aside from the material just discussed relative to nonobligated spouses, Public Act 211 does not set forth procedures to be used by the MDT to implement the tax intercept program. However, Section 30a(9) authorizes the MDT to promulgate rules in this regard.

## C. *The Current Tax Intercept Program, the DSS, and Due Process*

■ It should be emphasized that the Tax Intercept Program is a bifurcated program. At present, it appears that the MDT interfaces with the specific agency which has certified and requested the intercept. There is a "pre-offset" stage which operates before the actual interception of tax refunds. There is also a second "offset" stage which occurs when an individual's tax refund (overpayment) is intercepted (offset) in order to satisfy a debt of a taxpayer. In Michigan, government department or agencies participate in this "pre-offset" phase in order to effect repayment of obligations to the state. (The Mi-

chigan courts, pursuant to adjudicated garnishment proceedings and orders, also use interception of tax refunds for the purpose of application to the payment of outstanding obligations.)

The DSS is responsible for the determination that an individual has or may have a debt due and owing under one of nine Department of Social Services programs. Those programs under which income tax refunds interception is utilized are: Child Support Aid to Dependent Children (ADC), non-ADC child support (General Assistance, Emergency Needs, Medical Assistance, Food Stamps, Foster Care, Child Support, FOC (Friend of the Court), and Non-Corporation Security Deposits. These programs pay benefits out of public funds to or on behalf of the individuals. When an individual receives an overpayment of welfare funds, receives emergency advances in the form of loans for which they execute repayment agreement, as well as pursuant to child support—whether voluntary or court imposed—they may incur a debt. When an individual fails to make good on this debt or when an individual fails to tender their child support obligations, for example, an individual may be certified as delinquent.

It is clear that plaintiff Johnson's and Knisley's actions arise under the child support program. Plaintiff Daniels's and Thrasher's complaints arise under one of the DSS programs.

The case identity of an individual who is certified as delinquent is entered on a computer tape which is forwarded to the MDT. The MDT runs a computer cross check and determines which of those individuals are on record as having filed income tax returns in previous years. (*See* Horn Affidavit, Ex. 1 attached to Defendant's Second Supplemental Brief in Support of Motion for Summary Judgment). The MDT send the DSS the matching list of individuals who have filed state income tax returns, together with the most recent address information contained on the tax bills.

At this point, the DSS forwards to each individual matched on the treasury list a "pre-offset" notice. This notice informs

the obligated individual of the intent of DSS to refer the individual's name to the MDT for collection of past due child support or any other specified unpaid DSS obligation(s). The individual is also informed that the state income tax refunds to which the individual may be entitled may be retained and applied towards satisfaction of the obligation.

This "pre-offset" notice is generally a computer-generated form. (*See* Ex. 2 to Defendant's Second Supplemental Brief in Support Motion for Summary Judgment). The name and last known address of the obligated individual, the social security number, and the DSS case number or court order number all appear at the top of the "pre-offset" form.

If an individual has filed a joint return, the second paragraph informs the non-obligated filer of the opportunity to protect his share of any refund. The next paragraph indicates the program under which an obligation has been incurred and informs the individual whom he may contact should he desire to contest any obligation. The specific agency, its address, and telephone number are also listed. (*See e.g.*, Defendant's Ex. 2, *supra.*) The agency listed is the agency which originated the intercept request. The form also sets forth the program or programs under which the debt was incurred, the amount owed and the specific agency to be contacted. The reviewing agency has the authority to review and verify that there is an obligation or change and eliminate any erroneous obligation.

The names of individuals with child support or DSS program obligations who have not requested a review or who have not prevailed in changing their obligations following a review, are forwarded to the MDT. It is at that point that the MDT assumes responsibility for the actual interception ("offset") of any income tax return due the obligated individual. Once the MDT intercepts a tax refund, an "offset" notice is sent to the obligated individual informing that individual that his income tax refund has been withheld and is being forwarded to the submitting agency in order to satisfy an outstanding obligation. (*See* Defendant's Ex. 3, *supra.*) The individual is also told that if the refund exceeds the obligation, the balance will be forwarded to him.

The offset notice also includes a paragraph which informs the individual that any question concerning the original amount of the refund may be addressed to the Tax Division, MDT. Both an address and a telephone number are provided. The notice also informs the individual that any questions he may have with respect to the amount of the obligation under the child support program or one of the DSS programs should be addressed to the agency identified on the notice.

In the case of a joint return, the "offset notice" is altered to include an additional paragraph which informs the potentially non-obligated spouse that he or she may claim his or her share of any refund by completing and forwarding an additional attached form. (*See* Defendant's Ex. 4, *supra.*) This non-obligated spouse allocation form details the manner in which the refund will be divided between the obligated and non-obligated spouse. The form also indicates that there is a statutory 30-day time limit in which the spouse must file.

An individual may contest an obligation or the amount of the obligation by contacting the agency identified on the "offset" notice. The agency contacted has the authority to make appropriate changes following its review including the authority to retain the entire refund or to refund part or all of the amount offset.

Thus the DSS sends out "pre-offset" notices only and does not send out "offset" notices. However, the MDT sends out "offset" notices upon interception of a tax refund but does not send out "pre-offset" notices. Defendant argues that throughout the offset process, individuals are given the opportunity to contest the Department's action through administrative review of the propriety of the Department's actions and that no time limit is set on requests for post-offset case reviews. Finally, defendant argues that administrative appeal is available should an individual be

dissatisfied with a determination of the reviewing agency.

Defendant emphasizes that the system implemented by the DSS and MDT requires that a pre-offset notice be sent as a *prerequisite* to the issuance of an offset notice. (*See* Defendant Ex. 1, *supra.*) Further, with every pre-offset notice there is a provision for a pre-offset hearing. Accordingly, there are no circumstances under which a tax refund offset is authorized under the system implemented pursuant to § 30a of 1985 P.A. 211 where a pre-offset notice and hearing are not provided. Finally, when sending out offset notices, MDT uses the list of individuals which was forwarded by DSS and which DSS used at the time it issued its pre-offset notices.

These current procedures provide for both pre- and post-offset notices and hearings before State officers authorized to correct any errors. Based on my review of the affidavits which the defendant has submitted and on my review of the relevant case law, I am satisfied that these procedures provide adequate information to apprise persons affected of their rights in light of the anticipated State action and that the opportunity for informal hearings provides them a means to challenge the action.

This case was filed over five years ago in January 1982. In 1982 I denied defendant's motions to dismiss pursuant to rule 12(b)(6) in *Knisley v. Monroe*, 539 F.Supp. 849 (W.D.Mich.1982), implicitly recognizing that the existing procedural protections did not satisfy the fourteenth amendment's due process guarantees. In October 1985, I ordered the parties to file updated briefs covering any changes in the case and statutory law relevant to the due process issue which might have emerged since that original ruling. In addition, the Court has undertaken its own independent research.

As I have previously mentioned, it appears that at least partly as a result of a consent judgment in the case of *Jones v. Ritsema*, No. 82–73574, slip op. (E.D.Mich. Mar. 29, 1984) the State has revised its procedures for providing notices and hearings with respect to the *federal* tax intercept program authorized pursuant to 42

U.S.C. § 664 and 26 U.S.C. § 6402. The federal program is explicitly authorized by statute and is independent from but functionally interrelated with the state program. The State fashioned a system which incorporates pre-offset notice and hearings and offset notice and hearings which was applied to all tax refund interceptions by DSS. The affidavits of Marc Roberts and Rose Wilbur indicate that the State believes that it was required by the consent decree to apply this State system to *State programs. See* Affidavit of Marc Roberts and Rose Wilbur in Defendant's Submissions, Pleading 56. It further appears that the State, at least with respect to DSS programs, has acted upon that belief.

Moreover, in *Jahn v. Reagan*, 584 F.Supp. 399 (E.D.Mich.1984) (*Jahn I*), and *Jahn v. Reagan*, 610 F.Supp. 1269 (E.D. Mich.1985) (*Jahn II*) the district court reviewed the due process procedures provided by the State as they relate to the Income Tax Refund intercept program. In *Jahn I*, the court found that the individual taxpayer's due process rights were not violated, and in *Jahn II* found that the provisions in the consent judgment in *Jones, supra,* satisfied procedural due process rights of the non-obligated individual filing a joint return with an obligated individual.

More recently, in *McClelland v. Massinga*, 786 F.2d 1205 (4th Cir.1986), the Fourth Circuit reversed a district court ruling which found a Maryland Statutory Tax Refund Interception Program unconstitutional. The district court that found the tax intercept statute violated the due process clause of the fourteenth amendment in that it failed to give notice of certification for intercept to the non-obligated spouse of two of the plaintiffs and failed to provide the plaintiffs with a *pre-intercept* hearing.

The State of Maryland sends a certification notice to affected taxpayers after receiving notice from the child support enforcement administration that an individual is delinquent in his child support obligations. The notice advises the individuals of the right to request an "investigation" and the method of doing so. After the tax refund is intercepted, the State, within fif-

teen days, informs the obligated individual of his right to appeal the interception. An appeal notice is received only by those who call a number on the reverse side of the interception notice and request an appeal.

Once the obligor appeals, he is provided an administrative hearing before an impartial review officer, with the right to have a record made of the proceedings, to be represented by counsel, to offer testimony, to present witnesses, and to submit oral argument. The Fourth Circuit held that these procedures offer sufficient protection to individuals obligated to the State of Maryland for delinquent child support. If the obligor receives an adverse decision, he has the right to judicial review.

The Fourth Circuit emphasized that the Maryland procedure provided obligated individuals with as much of a pre-deprivation "hearing" as was given the recipients in *Matthews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Moreover, the court noted that the temporary deprivations suffered by obligated individuals do not approach the "brutal need" of those claimants in *Goldberg v. Kelley*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) who were living on the "very margin of subsistence." The court also noted that the incomes of the *McClelland* plaintiffs were much higher than those of the recipients of disability benefits in *Matthews*. (Indeed, the court noted that three of the plaintiffs had incomes of more than $30,000 a year. I note in passing that these observations of the relatively high incomes of three of the seven *McClelland* plaintiffs in the context of the discussion of whether a pre-deprivation or post-deprivation hearing is required suggests that in the case *sub judicie* problems of commonality, typicality, and adequacy of representation might be said to exist not only with respect to the certification of the broader class, but with respect to the certification of the more narrow class as well).

The Fourth Circuit argued most persuasively that a full pre-intercept hearing is not only impractical but is also more burdensome than a full post-intercept hearing. It noted, for example, that as many as ⅔ of the obligors who are certified will not be entitled to a refund and would not be entitled to a hearing. Moreover, not all those entitled to a hearing would necessarily object to the intercepts.

The *McClelland* court concluded that a pre-intercept "hearing" was not required and that the State's procedures properly balanced the need to protect the obligated person from erroneous deprivation and the difficulty in collecting overdue child support obligations.

The Michigan system as it exists today offers due process protections which appear to meet or surpass those sanctioned by the Court of Appeals in *McClelland, supra*. Moreover, *Jones, supra*, and *Jahn I & II, supra*, have approved Michigan's efforts to afford due process protections to those individuals who have or may incur obligations to the State under various state programs.

Of course, because of the class certification ruling which this Court has made, it offers no opinion on the adequacy of the due process protections of any other Michigan department or agency. Defendant, however, observes that the "1985 P.A. 211 has a broad sweep which *will require* a similar notice and review procedure by all Michigan departments or agencies." (emphasis added). Defendant's Second Supplemental Brief in Support of Motion for Summary Judgment at 22.

In summary, the Michigan Tax Intercept Program as applied to debts which arise under DSS obligations is a practical attempt to balance the rights of the potentially obligated individuals with those of government. The bifurcated system provides two levels of notice and hearing. It seems proper that DSS hear the DSS-related issue. DSS is the involved agency and has the records and expertise to address the issues before it.

Issues which relate to the propriety of a refund or to its size are properly before the MDT which collects and disburses funds. In both situations, the reviewing authority may make and implement a ruling which changes or eliminates any alleged obligation. The Court finds no merit in plaintiffs' argument that the true defendant is the defendant Treasurer who sends only

one offset notice and that defendant has attempted to substitute the DSS as the real party. Plaintiffs' argument, quite simply, elevates form over substance. The State has quite rationally chose to bifurcate its tax intercept program. While it is true that the authority to implement procedures is found in Section 30a(9) of P.A. 211, the State has in effect delegated the pre-offset notice and hearing procedures to the agency which is seeking to collect monies owed to it.

In this case, each plaintiff had either incurred a debt under a DSS program or had their funds co-mingled with those of an allegedly obligated individual. The present system allows unobligated co-mingled funds to be withdrawn with a modicum of delay and inconvenience. Plaintiffs are also protected from erroneous deprivation under a DSS program: if one of the plaintiffs had not had a DSS debt, it appears that his refund could and would have been returned.

Under the standards set forth in *Matthews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) the Court must balance four factors.

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*Matthews,* 424 U.S. at 335, 96 S.Ct. at 903. First, the private interest, that is, the interest that people in plaintiffs' case—not only non-obligated spouses but those whose DSS-related program debt is somehow in error as well—have in receiving that tax refund is not insignificant. However, it is clear that an obligor does not have an expectation of *immediate* receipt to such refund. Under the current procedures, the private interest is sufficiently protected by official action and interferences is kept to a minimum.

Second, the risk of erroneous deprivation under the bifurcated system is not substan-

tial. Erroneous deprivation is currently avoidable and capable of being corrected by notice and review at both the pre-offset and offset levels.

Third, the probable value of additional or substitute procedural safeguards factor appears to the Court for all practical purposes to be moot given the *current* procedures. In fact, it appears to this Court that the only thing that the notices at issue in this case do not do, which plaintiffs originally requested, is to list all possible defenses that a person affected might assert. The Court will analyze this issue in more detail below.

Finally, the government has a significant interest in collecting overdue obligations. The Court believes that the current procedures strike the proper balance between the process due a citizen who may owe an obligation that is past due and the fiscal responsibility that the government has to collect its debts. I am satisfied that these procedures rectify plaintiffs' original complaints as well as any remaining complaints which are legitimate.

As the Court has tried to make clear, it believes that the notice and review system currently in place not only comports with due process under the *Matthews* test, but has been approved by other federal district courts as well as by the Fourth Circuit in *McClelland.* With respect to the listing of possible defenses issue, there is some case law which suggests that under certain contexts a clear and detailed predeprivation notice which specifies the possible defenses is necessary to afford due process protections for those individuals who have had their tax refunds intercepted. *See, e.g., Nelson v. Regan,* 560 F.Supp. 1101 (D.Conn.1983), *aff'd,* 731 F.2d 105 (2d Cir. 1984), *cert. den.,* 469 U.S. 853, 105 S.Ct. 175, 83 L.Ed.2d 110 (1985).

*Nelson* concerned an action challenging the federal-state intercept program under which *federal* income tax refunds may be transferred to the state to the extent of the taxpayer's past-due support obligations. The Court emphasized that because many of those targeted for intercepts were relatively uneducated and uninformed about

their legal rights, both pre-offset and off-set notices must mention possible defenses as well as the procedures by which a tax-payer could challenge the offset.

Under the challenged procedures, alleg-edly delinquent individuals were not told the claimed amount of their obligations or the fact that their names had already been certified by the state agency in charge of implementing the intercept program to the IRS.

The *Nelson* court also found that the federal-state intercept program not only failed to mention possible defenses, but also failed to mention the availability of regular procedures through which the off-set could be challenged. Specifically, the challenged notice merely indicated that the agencies identified in the notice were avail-able to answer questions and did not men-tion, for example, that the complainant could obtain a pre-interception review by a state official followed by a right to a court hearing.

The court concluded that the absence of a predetermination review deprived the tax-payers of an opportunity to be heard at a meaningful time and in a meaningful man-ner. In making its determination, the Court emphasized that a predeprivation hearing was not impracticable. *Nelson*, 560 F.2d at 1107–08.

Other courts have not required that all possible defenses be listed and have found that a predeprivation hearing *would be* im-practicable. In *McClelland*, for instance, the plaintiffs did not even appeal the dis-trict court's dismissal of their claim that the notice of intercept provide the obligors with "a list of all possible defenses." In viewing the totality of the circumstances surrounding the Michigan certification and notice procedures, I am not convinced that such explicit notices are required. Further, given the variety of situations giving rise to state tax intercept within the DSS pro-grams, listing possible defenses may not be practicable.

I do find that certain paragraphs of the notices at issue are written in that all too familiar style of "computerese." By that, I mean that the style of presentation is cold, impersonal, and staccato—even as individu-al sentences sometimes "run-on" cramming too much information into one unit of ex-pression. *See, e.g.*, Defense Ex. 2, "The Pre-Offset Notice Form, paragraph 2 on Joint Returns." I suggest that carefully rewriting the most convoluted paragraphs in "plain English" could only result in bet-ter communication and would make every-one's job a little easier. Moreover, the style appears to violate the cardinal rule of good writing: know your reader. Still, while offending good taste, common sense, and undoubtedly the elements of style as set forth by William Strunk, Jr. and E.B. White, when viewed as a whole I do not believe that the current notice offends the elements of due process. I also note that while in the present context due process does not require a list of all possible de-fenses, the better practice may be to list a number of those most frequently asserted.

## IV.  *Conclusion*

■ This action was originally brought to enjoin the defendant from "absconding with income tax refunds of individuals without providing rudimentary due pro-cess." The Court finds that there is no continuing violation of the due process rights of the prospective plaintiff class. Subsequent developments in the case and statutory law have rendered these claims moot. Notice relief pursuant to *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) is not available because such relief must be ancillary to some other relief which the Court has the power to grant. Here, there is no other relief as to which notice relief would be ancillary. Put differently, the Court holds that the re-maining claims for declaratory and "notice relief" relate to *past* violations of federal law and that retrospective relief for such claims is barred by the Eleventh Amend-ment, *See Green v. Mansour*, 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985).

While the Court admits that P.A. 211 may not be applicable to other instances of tax refund intercepts, and that procedures which agencies other than the MDSS cur-rently use may violate due process, the issue of the deficiency of *those* procedures is not before the Court because these plain-tiffs do not have standing to raise it. The

1555

Court believes, however, that the procedures set forth in P.A. 211 working in tandem with the pre-offset procedures currently developed and issued by the MDSS do offer due process protections to all plaintiffs in plaintiffs' class.

The Court recognizes that the somewhat delayed ruling as to class certification may have contributed to making this case more complex than it needed to be. However, while the Court has consistently asked for information concerning to what extent other agencies are involved in the tax intercept program and what procedures such agencies use in certifying potential debtors to the MDT, defendant was dilatory in providing that information.

Accordingly, for all the reasons just presented, plaintiffs' motion for class certification, as modified, is granted. Plaintiffs' motion for summary judgment is denied; and defendant's motion for summary judgment is granted.