Richard H. GENS

v.

The UNITED STATES.

Richard H. and Helen D. GENS

v.

The UNITED STATES.

Nos. 77–74, 78–74.

United States Court of Claims.

Feb. 20, 1980.

**1336**

David S. Fox, Boston, Mass., attorney of record, for plaintiffs.

Theodore D. Peyser, Washington, D. C., with whom was Asst. Atty. Gen., M. Carr Ferguson, Washington, D. C., for defendant. Israel D. Shetreat, Washington, D. C., of counsel.

Before DAVIS, NICHOLS and SMITH, Judges.

### ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

SMITH, Judge:

In this consolidated action, plaintiffs sue for refund of income taxes overpaid for the years 1968, 1970, and 1971, which overpayments the Commissioner of Internal Revenue applied to satisfy certain 100-percent penalty assessments made against plaintiff Richard Gens pursuant to section 6672 of the Internal Revenue Code of 1954,[1] and for refund of token payments made by plaintiff Richard Gens [2] with respect to certain other 100-percent penalty assessments. The Government has filed a counterclaim for the unpaid portion of the penalty assessments and for interest assessments made with respect to the penalty assessments. The case is before the court on the Government's motion for summary judgment. The Government asks that the petitions setting forth the refund claims be dismissed and that judgment in its favor be entered with respect to the counterclaim.

In ruling on the Government's motion, the court has considered four issues:

(1) Is there a genuine issue of fact as to whether the Government misapplied funds received from trustees in bankruptcy as payment of the employment tax liabilities of a group of corporations for which plaintiff has admitted that he was

---

1. 26 U.S.C. § 6672 (1976). Hereinafter, all code references are to the Internal Revenue Code of 1954 as appearing in 26 U.S.C. (1976).

2. "Plaintiff" used hereinafter refers to plaintiff Richard H. Gens unless stated otherwise.

a responsible person under section 6672? We hold that the record before us discloses indisputably that the Government did not misapply these funds.

(2) Is the Government obligated to abate the penalty assessments against Richard Gens to the extent that it has collected penalty assessments arising from the same employment tax liabilities from two erstwhile business associates of this plaintiff? We hold that, at the present time, the Government is not under such an obligation.

(3) Was the statute of limitations[3] on collection of the penalty assessments made against plaintiff Richard Gens in 1971 tolled by the filing of an involuntary petition in bankruptcy against this plaintiff? We hold that the running of the period of limitations was suspended by the filing of the bankruptcy petition and that the suspension lasted until 6 months after the bankruptcy court adjudged that Richard Gens was not a bankrupt.

(4) Is there a genuine issue of fact as to whether plaintiff Helen D. Gens is entitled to a refund of a portion of the income tax overpayments? We conclude that the facts in the record before us are insufficient to permit us to answer this question and, therefore, that the action should be remanded to the trial division for it to make appropriate findings of fact with respect to this issue.

This case is a prime example of the inadequacy of the statutory remedies presently available to the Government and to taxpayers in resolving disputes concerning the liability for payroll taxes to which the Government is entitled. The case is otherwise exceptional only because most of the material facts underlying the case are not in dispute. For one or more quarters in 1970, 21 corporations which operated nursing homes failed to pay over to the Federal Government income withholding and FICA taxes (hereinafter referred to as payroll taxes). On March 19, 1971, the Internal Revenue Service (IRS) assessed against plaintiff Richard Gens 100-percent penalties equaling in amount the unpaid 1970 payroll tax liabilities of 14 of these corporations. (Hereinafter these 14 corporations will be referred to as the Massachusetts group.) The 100-percent penalty assessments were made pursuant to section 6672 of the Internal Revenue Code.[4] On March 29, 1971, the Massachusetts group of corporations instituted Chapter XI bankruptcy proceedings in the United States District Court for the District of Massachusetts and were later adjudged bankrupts. On October 18, 1971, a creditors' petition requesting that plaintiff Richard Gens be adjudged a bankrupt was filed in the United States District Court for the District of Massachusetts. On April 3, 1972, the creditors' petition was dismissed, the bankruptcy court adjudging that Richard Gens was not a bankrupt.

On January 15, 1973, the IRS assessed against plaintiff Richard Gens section 6672 penalties in the amount of the unpaid 1970 payroll tax liabilities of the other seven nursing home corporations. (Hereinafter these seven corporations will for convenience be referred to as the Connecticut group although not all operated in Connecticut.) In 1973, Richard Gens made token payments to the IRS with respect to the Connecticut-group penalty assessments and then filed with the IRS timely claims for refund of the payments. The IRS denied the claims. Also, in 1973, plaintiff Richard Gens and his spouse, plaintiff Helen Gens, filed timely claims with the IRS for refund of income tax overpayments made with respect to taxable years 1968, 1970, and 1971. With respect to those years, plaintiffs had

3.  I.R.C. § 6502.

4.  At all times pertinent to this case, section 6672 provided:

"Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over. No penalty shall be imposed under section 6653 for any offense to which this section is applicable."

filed joint income tax returns. The IRS denied the claims for refund, indicating that the overpayments had been credited against the penalty assessments made against Richard Gens with respect to the Massachusetts group of corporations.

In 1974, plaintiff Richard Gens filed a timely petition in this court (No. 77–74) for refund of the aforementioned token payments made with respect to the Connecticut group. Concurrently with the filing of that petition, plaintiffs Richard Gens and Helen Gens filed a separate timely petition in this court (No. 78–74 for refund of the aforementioned income tax overpayments.

On January 12, 1977, the United States District Court for the District of Massachusetts ordered the trustees in bankruptcy for the Massachusetts group of corporations to pay the sum of $382,294.52 to the Government to satisfy the payroll tax liabilities outstanding in the names of the corporations of the Massachusetts group. The Government received payment of the aforementioned sum on January 17, 1977. As a result of this collection of the taxes for which the corporations were liable, the IRS abated, on July 6, 1977, the 100-percent penalty assessments which had been outstanding in the name of plaintiff Richard Gens with respect to the 14 corporations of the Massachusetts group. On June 23, 1977, and July 7, 1977, the IRS transferred the income tax overpayments which had been credited against the Massachusetts-group penalty assessments to credit against the penalty assessments made against Richard Gens with respect to the Connecticut group.

On November 2, 1977, the IRS assessed against Richard Gens interest on the Massachusetts-group penalty assessments, said interest being computed from March 19, 1971, to January 17, 1977, the date it received from the trustees in bankruptcy, payment of the underlying taxes. On November 30, 1977, the Government filed a counterclaim in this case for the interest assessments and for the unpaid amount of the Connecticut-group penalty assessments. In its brief in support of its motion for summary judg-

ment, the Government revised its computation of the interest assessments so that it now seeks interest on the Massachusetts-group penalty assessments from March 29, 1971, to January 17, 1977.

Plaintiff Richard Gens has admitted that, for 1970, he was a responsible person liable under section 6672 with respect to 20 of the nursing home corporations. With regard to the remaining corporation, the Government has agreed that he was not a responsible person under section 6672.

I.

■ Plaintiff contends that the Government misapplied the payment which it received from the Massachusetts-group trustees in bankruptcy. Plaintiff argues that, with respect to three Massachusetts-group corporations which operated under names different from the names by which the three were incorporated, the portion of the payment which the Government applied to satisfy the 1970 payroll tax liabilities of the three corporations exceeded by $87,522.59 the actual amount of the liabilities. To support his argument, plaintiff refers the court to the Government's counterclaim in this case. In the counterclaim, the Government has erred by treating the three corporations as being six corporations. In other words, the Government has listed each of the corporations twice, once in the operating name of the corporation and once in the name by which the corporation was incorporated.

The Government acknowledges that it has made this error in its counterclaim. The Government denies, however, that the 1970 payroll tax liabilities of the three corporations were paid twice. To support its denial, the Government points to the order of the bankruptcy court directing the payment which was made by the Massachusetts-group trustees.

We have examined the order of the bankruptcy court and the payment list which it incorporated by reference. The list cited only one name, and not the other, of each of the three corporations. Therefore, none of their payroll tax liabilities was paid twice

under the terms of the order. With respect to the manner in which the Government applied the payment which it received pursuant to the order, IRS documents included in the record before us indicate clearly that the payment was applied in accordance with the terms of the order.

Thus, we hold that the Government did not misapply the payment which it received from the Massachusetts-group trustees in bankruptcy.

## II.

Plaintiff contends that the Government is obligated, because of IRS Policy Statement P–5–60,[5] to abate the penalty assessments made against him to the extent that it has collected penalty assessments arising from the same payroll tax liabilities from two of plaintiff's erstwhile business associates. The Government states that it is willing to and would make such an abatement at such time as its right to retain any collections made from the erstwhile business associates is established.

The record before us discloses that the IRS has in fact collected some penalty assessments from both of the former business

associates. With respect to one of the associates, the record discloses that the collection is the subject of a pending lawsuit filed by the associate to obtain a refund of the amount collected. With respect to the other associate, the record discloses that the IRS has refunded to that associate, as part of a settlement involving other years, the amount collected. Nowhere in the record is there any evidence that the IRS has an established right to retain any collection made from either associate.

The Internal Revenue Service is entitled to assess 100-percent penalties against any or all persons liable under section 6672 of the Internal Revenue Code.[6] The Government can enforce these assessments until it has collected successfully an amount equal to the payroll tax liability which has given rise to the penalty assessments. Pursuant to the policy embodied in IRS Policy Statement P–5–60, the Government is entitled, through an assertion of 100-percent penalty assessments, only to one satisfaction of the payroll tax liability; once the Government has obtained a single satisfaction, it must abate all 100-percent penalty assessments which have arisen from the payroll tax liability.[7] When the Government seeks satis-

---

**5.** IR Manual, MT 1218–56 (Feb. 25, 1976), *reprinted in* [1979] 8 Stand.Fed.Tax Rep. (CCH) ¶ 5569.01. IRS Policy Statement P–5–60 reads as follows:

"The 100-percent penalty (applicable to withheld employment taxes or collected excise taxes) will be used only as a collection device. If a corporation has willfully failed to collect or pay over employment taxes, or has willfully failed to pay over collected excise taxes, the 100-percent penalty will be asserted against responsible officers and employees of the corporation only if such taxes cannot be collected from the corporation itself. If a corporation willfully failed to collect excise taxes, the 100-percent penalty will be asserted against responsible officers and employees of the corporation, provided the taxes have not been collected from the actual taxpayers liable therefor, and the 100-percent penalty cannot be collected from the corporation itself. When court proceedings are involved, an abatement of the tax assessment against the corporation will be made to the extent that the related 100-percent penalty assessment is paid, with no exception for cases involving fraud or flagrant noncompliance.

"When the person responsible for withholding, collecting and paying over taxes cannot

otherwise be determined, the Service will look to the President, Secretary, and the Treasurer of the Corporation as responsible officers.

"In determining the amount of the 100-percent penalty to be assessed in connection with employment taxes, any payment made on the corporate account involved is deemed to represent payment of the *employer* portions of the liability (including assessed penalty and interest) unless there was some specific designation to the contrary by the taxpayer. The taxpayer, of course, has no right of designation in the case of collections resulting from enforced collection measures. To the extent partial payments exceed the *employer* portion of the tax liability, they are considered as being applied against the trust fund portion of the assessment." (Emphasis in original.)

**6.** *White v. United States,* 372 F.2d 513, 178 Ct.Cl. 765 (1967); *Scott v. United States,* 354 F.2d 292, 173 Ct.Cl. 650 (1965).

**7.** *Kelly v. Lethert,* 362 F.2d 629 (8th Cir. 1966). The policy of the Government not to increase its coffers by an amount exceeding the payroll tax liability is an acknowledgement that section 6672 operates not as a penalty, but merely as a

**1340**

faction of the payroll tax liability vis-a-vis an assertion of 100-percent penalty assessments, it is entitled to "choose the liable parties from whom it will collect." [8]

■ Successful collection by the Government of an assessment arising from the payroll tax liability is achieved only when the Government's right to retain an administratively made collection of the assessment is established. It has been held that the right is established "only upon expiration of the statutory period for commencement of a refund suit or, if a refund suit is filed, upon final adjudication of the action." [9] Only when the Government's right to retain an administrative collection is established does it become incumbent on the Government to abate, in the amount of the collection, all 100-percent penalty assessments arising from the payroll tax liability.[10]

■ In the instant case, the administrative collection made from one of plaintiff Richard Gens' former business associates is the subject of a pending refund action. Thus we hold that plaintiff is not entitled, at the present time, to an abatement in the amount of this collection. The administrative collection made from the other associate has been refunded to that associate pursuant to a settlement involving other years. We must assume that the Government has acted in good faith in such settlement, there being nothing in the record to indicate otherwise. Cognizant that, ordinarily, the Government may "choose the liable parties from whom it will collect" and that the refund in this case to one of plaintiff's former business associates may be said to be tantamount to an exercise of the power to choose, we hold that plaintiff is not entitled at the present time to an abatement in the amount of the collection refunded to his former associate.

## III.

Did the filing of the involuntary petition in bankruptcy against plaintiff suspend, to the time of the adjudication that he was not a bankrupt and for 6 months thereafter, the running of the section 6502 period of limitations on collection of the 100-percent penalty assessments made against plaintiff on March 19, 1971? Plaintiff and the Government agree that, if the answer to the question is affirmative, the Government's November 2, 1977, assessments of interest against plaintiff and its filing of the counterclaim for the assessed interest were not time-barred. Conversely, plaintiff and the Government agree that, if the answer to the question is negative, the assessments of interest and the filing of the counterclaim were time-barred.

Section 6503(b) of the Internal Revenue Code declares that "[t]he period of limitations * * * prescribed in section 6502 shall be suspended for the period the assets of the taxpayer are in the control or custody of the court in any proceeding before any court of the United States * * *, and for 6 months thereafter." Treasury Reg. § 301.6503(b)–1 (1956), as amended, T.D. 7121, 1971–2 C.B. 411, construes section 6503(b) to require that the control or custody be of "all or substantially all of the assets" of a taxpayer. The congressional purpose underlying the enactment of section 6503(b) has been expressed as follows: "[Section 6503(b) suspends the running of section 6502] where assets are in the control or custody of a court because during this time they are not subject to administrative collection procedures." [11]

Plaintiff argues that section 6503(b) requires a case-by-case factual determination of the question whether a bankruptcy court

means of insuring that the Government will be able to collect the amount of payroll tax due it. In the words of Policy Statement P–5–60, "The 100-percent penalty * * * will be used *only as a collection device.*" (Emphasis supplied.)

**8.** *Abrams v. United States*, 333 F.Supp. 1134, 1147 (S.D.W.Va.1971).

**9.** *Crompton-Richmond Co. v. United States*, 311 F.Supp. 1184, 1185 (S.D.N.Y.1970).

**10.** *Id.*

**11.** S.Rep. No. 1708, 89th Cong., 2d Sess. 24–25, *reprinted in* [1966] U.S.Code Cong. & Admin. News, pp. 3722, 3745.

has control over or custody of the assets of an alleged bankrupt. More specifically, plaintiff argues that the *mere* filing of an involuntary petition in bankruptcy does not establish in the bankruptcy court, for purposes of section 6503(b), control over or custody of the assets of the alleged bankrupt. According to plaintiff, the institution of a bankruptcy proceeding does not result automatically in a suspension of the running of section 6502; in order for section 6502 to be suspended, plaintiff argues, the bankruptcy court must *assert* and *exercise* jurisdiction over the assets of the alleged bankrupt. Because plaintiff was adjudicated not to be a bankrupt and because the bankruptcy court never appointed a trustee in bankruptcy with respect to his assets, plaintiff contends that his assets were never, for purposes of section 6503(b), in the control or custody of the bankruptcy court.

The Government argues that the filing of a petition in bankruptcy, even if the petition is involuntary and even if the bankruptcy court dismisses the petition ultimately, does suspend automatically the running of section 6502 and that the suspension lasts for the period prescribed in section 6503(b). With respect to the instant case, the Government argues that section 6502 was tolled from the time of the filing of the petition in bankruptcy against plaintiff to the time of his being adjudicated not a bankrupt and for 6 months thereafter.

The issue presented has not been decided heretofore by this court. In resolving the issue in favor of the Government, we have looked for guidance to two cases: *Acme Harvester Co.*[12] and *McAuley*.[13]

In *Acme Harvester Co.*, a few of the creditors of Acme Harvester Company (Acme) filed in a federal district court an involuntary petition in bankruptcy against Acme. The federal district court decided not to adjudicate Acme a bankrupt; however, it never entered an order dismissing the bankruptcy petition. Approximately 6 weeks after the filing of the petition, one of the creditors which had filed the petition filed an action against Acme in a state court. In the action, the creditor sought to recover a judgment on an account owed by Acme to the creditor. Before it filed an answer in the state court action, Acme obtained from the federal district court an injunction prohibiting the creditor from prosecuting the state court action. Armed with the injunction, Acme filed in the state court action an answer setting forth two defenses: the injunction and the pendency of the bankruptcy proceeding.

The state court tried the creditor's action and entered judgment in favor of the creditor. The judgment was appealed by Acme to the highest state appellate court. That court affirmed the judgment, holding that, by the time of the institution of the state court action, the federal district court had relinquished its jurisdiction by declining to adjudicate Acme a bankrupt. From the judgment of the state's highest appellate court, Acme appealed to the United States Supreme Court.

That Court formulated the issue before it as follows: "Should the state court have declined to exercise its jurisdiction when the pending proceeding in bankruptcy was set up in denial of the right to entertain further proceedings in the state tribunal?"[14] Interpreting the Bankruptcy Act of 1898, the Supreme Court held that one purpose of federal bankruptcy law was[15]

> to hold the property of the bankrupt intact from the time of the filing of the petition, in order that it may be administered under the law if an adjudication in bankruptcy shall follow the beginning of the proceedings. * * * Pending the proceedings the law holds the property to abide the decision of the court upon the question of adjudication as effectively as

12. *Acme Harvester Co. v. Beekman Lumber Co.*, 222 U.S. 300, 32 S.Ct. 96, 56 L.Ed. 208 (1911).

13. *McAuley v. United States*, 525 F.2d 1108 (9th Cir. 1975).

14. *Acme Harvester Co. v. Beekman Lumber Co.*, *supra* note 12, 222 U.S. at 306, 32 S.Ct. at 99.

15. *Id.* at 307–08, 32 S.Ct. at 99–100.

if an attachment had been issued * *.
* * *

Thus, according to the Court, the jurisdiction in a bankruptcy proceeding was "so far *in rem* that the estate is regarded as *in custodia legis* from the filing of the petition." [16]

Applying its interpretation of federal bankruptcy law to the particular situation of Acme Harvester Company, the Supreme Court held that, by the time of the institution of the state court action, the federal district court *had relinquished* its bankruptcy jurisdiction through declining to adjudicate Acme a bankrupt. Thus, according to the United States Supreme Court, the prosecution of the state court action was proper.

In *McAuley, supra* note 13, the issue presented to the United States Court of Appeals for the Ninth Circuit was not whether the institution of a bankruptcy proceeding resulted at all in the suspension of section 6502 pursuant to section 6503(b), but whether the suspension terminated 6 months after the closing of the bankruptcy estate or 12 months after the date of the first creditors' meeting. In resolving that issue, that court held that section 6503(b) did not require a factual determination of the question of whether a bankruptcy court had control over or custody of all or substantially all of the assets of a taxpayer. The ninth circuit refused to construe section 6503(b) to require such a factual determination because of the difficulty that a court would encounter in making such a determination.

■ On the basis of the guidance provided by *Acme Harvester Co.* and *McAuley*, we conclude that the filing of an involuntary petition in bankruptcy does establish automatically in the bankruptcy court, for purposes of section 6503(b), control over or custody of all or substantially all of the assets of the alleged bankrupt. Furthermore, we conclude that where the petition is dismissed through an adjudication that

the alleged bankrupt is not a bankrupt, the control or custody of his assets continues to repose in the bankruptcy court to the time of the adjudication. Thus, we hold that the running of the section 6502 period of limitations on collection of the Massachusetts-group penalty assessments made against plaintiff Richard Gens was suspended from the time of the filing of the bankruptcy petition against plaintiff to the time of his being adjudicated not a bankrupt and for 6 months thereafter. Because section 6502 was tolled for that period, the November 2, 1977, assessments of interest against plaintiff Richard Gens and the filing of defendant's counterclaim for the assessed interest were not time-barred.

### IV.

■ Plaintiff Helen Gens is seeking a refund of one-half of the income tax overpayments made with respect to the joint income tax returns which plaintiff Richard Gens and she filed for taxable years 1968, 1970, and 1971. The Government has credited the entire amount of the overpayments against the 100-percent penalty assessments made against plaintiff Richard Gens.

It is well settled that "[s]pouses filing a joint return have separate interests in any overpayment, the interest of each depending on his or her income, i. e., an overpayment is apportionable to a spouse to the extent that he or she contributed to the overpaid tax." [17] The IRS itself has acknowledged that "a joint income tax return does not create new property interests for the husband or the wife in each other's income tax overpayment." [18]

With respect to the instant case, the facts in the record before us are insufficient to permit us to determine whether plaintiff Helen Gens was the source of any portion of the income tax overpayments made with respect to the 1968, 1970, and 1971 joint income tax returns. If her income was the source of any of the overpayments, the

---

**16.** *Id.* at 307, 32 S.Ct. at 99.

**17.** *Rosen v. United States*, 397 F.Supp. 342, 343 (E.D.Pa.1975).

**18.** Rev.Rul. 74–611, 1974–2 C.B. 399.

Government is not entitled to credit the portion of the overpayments arising from her income against the penalty assessments made against Richard Gens. On the other hand, if the entire amount of the overpayments arose from the income of Richard Gens, the Government is entitled to credit the entire amount against the penalty assessments. We remand that portion of the case to the trial division to make the factual determination of the extent to which Helen Gens was the source of the income tax overpayments made with respect to the 1968, 1970, and 1971 joint income tax returns.

### V.

Upon consideration of defendant's motion for summary judgment, together with plaintiffs' response thereto, and of the full record before us, without oral argument, we hold that plaintiff Richard H. Gens is not entitled to recover either in No. 77–74 or in No. 78–74; the consolidated case is remanded to the trial division for a determination whether plaintiff Helen D. Gens is entitled to any refund and, if so, in what amount, and of the amount defendant is entitled to recover under its counterclaim. Defendant's motion for summary judgment is allowed in part and denied in part in accordance with these holdings.