James A. SCHULTZ, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 68–87T.

United States Claims Court.

Jan. 18, 1990.

B. Gray Gibbs, St. Petersburg, Fla., for plaintiff.

Robert N. Dorosin, with whom were Asst. Atty. Gen. Shirley D. Peterson, Mildred L. Seidman and David Gustafson, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

This is a claim for refund of $100.00 in taxes which plaintiff has paid toward a $20,691.38 penalty assessed against him under § 6672 of the Internal Revenue Code ("the I.R.C."), 26 U.S.C. § 6672 (1982). Defendant has counterclaimed for the balance of the assessment, plus interest, for a total amount of $21,697.07.

There are two issues. The first is whether plaintiff, while a corporate officer of the now dissolved Florida Corporation, Chrisandrea, Inc., was, pursuant to I.R.C. § 6672, under a duty to collect, account for, and pay over to the Federal Government Federal Insurance Contributions Act ("FICA") taxes and income taxes (collectively "trust fund taxes") which were withheld from the

wages of Chrisandrea employees. The second issue is whether, if plaintiff was under such a duty, his failure to pay trust fund taxes was willful.

The matter was tried on October 2 and 3, 1989. After consideration of the evidence and relevant law, the court concludes that plaintiff was under a duty to collect and pay withheld FICA and income taxes, and that the failure to pay the delinquent taxes was willful.

## BACKGROUND

Plaintiff is a former truck driver from Lansing, Illinois. In the summer of 1983, after 14 years of employment with Western Transportation's tractor-trailer unit, plaintiff was on disability and was interested in investing in a business. Plaintiff had collected a considerable sum from workman's compensation, and in addition had funds available from savings, stocks, and inheritance. Plaintiff's only prior business experience was operating a small tavern in Illinois with his wife. That business operated with no employees, and all tax matters were handled by an accountant.

In September 1983, a friend informed plaintiff that Fred Wleklinski, who at the time was employed as a purchasing agent for the Kapok Tree restaurant chain in Clearwater, Florida, might be interested in entering the restaurant business in Tampa, Florida. Plaintiff met with Wleklinski in Tampa. Wleklinski informed plaintiff that he had significant experience in the restaurant business, and that he had acquaintances in Tampa who were also familiar with the restaurant business.

While in Tampa, plaintiff investigated an opportunity to take over the food and beverage operation of the Bayfront Concourse Hotel in St. Petersburg. After a promising meeting with Darrel Wilde, the hotel's general manager, plaintiff met with Wleklinski and two of Wleklinski's business associates, Manuel Van Vures, who was then the general manager of the Kapok Tree restaurant in Clearwater, and Steve Havrilla, the Kapok Tree's chef. With the help of Thomas P. Panichi, plaintiff's attorney from Lan-

sing, the four formed a Florida corporation, Chrisandrea[1], Inc., to run the food and beverage operations at the Bayfront Concourse. The corporation officially came into existence on September 14, 1983.

Plaintiff was named President of Chrisandrea. Van Vures was made Vice-president, Havrilla became Treasurer, and Wleklinski was named Secretary. The same four men also constituted Chrisandrea's directors. It is clear from trial testimony that the titles each of the four investors held were mere formalities. No one was entirely clear as to the responsibilities associated with their positions, no formal directors' or officers' meetings were held, and no minutes or other records were kept of any discussions among the four.

The four men each received a 25% interest in Chrisandrea. Van Vures, Wleklinski, and Havrilla received their shares in exchange for expertise and services—Van Vures was to be general manager, Havrilla head chef, and Wleklinski purchaser of food, beverages and other supplies. Plaintiff received his 25% share in Chrisandrea in exchange for contributing capital. Plaintiff was the sole contributor of capital. Although plaintiff was President, it was expected that he was to be merely a "silent investor," helping out when in Tampa, but leaving the day-to-day operation of Chrisandrea to the other three.

Once Chrisandrea's operations began, plaintiff's role as a silent a partner ended. From the very outset, plaintiff spent considerable time at the Bayfront Concourse overseeing the operations of Chrisandrea. Judith Schwing, Chrisandrea's office manager, testified that "it seemed like he was there all the time." Van Vures testified that plaintiff was present 85–90% of the time. Plaintiff himself admitted that he made several trips to Tampa because he wanted to observe Chrisandrea's operation in the hopes of learning the restaurant business. He had use of one of the desks in Judith Schwing's office.

Plaintiff did not assume any specific duties at Chrisandrea. He did, however,

1. The name "Chrisandrea" was derived from the first names of plaintiff's two daughters.

occasionally hire entertainers. Also, like Chrisandrea's other officers, he was authorized to sign checks, and did sign payroll and other checks when approached by office manager Judith Schwing. (Schwing testified that when she needed a signature, she would get one from whichever of the four she could find.)

Even though plaintiff had no specific duties at Chrisandrea, he was the recognized "money man," and was apparently the boss. Schwing testified that although all the partners were authorized to sign checks, she felt sure that plaintiff had the last word as to where Chrisandrea's money went. She also testified that if there ever had been a conflict among the four partners, she would have abided by plaintiff's instructions. Plaintiff testified that he would take from Chrisandrea's petty cash for personal use. Apparently none of the others did.

From testimony at trial, as well as the stipulation of facts, it is clear that plaintiff's authority extended beyond financial matters. Although Van Vures was in charge of hiring and firing, for example, plaintiff on one occasion overrode Van Vures' decision to fire a particular bartender because in plaintiff's view that bartender was "good for business." On another occasion plaintiff, after hearing of friction between Van Vures and hotel manager Wilde, directed Van Vures not to deal with Wilde. Thereafter plaintiff served as the sole liaison between Chrisandrea and Wilde. In another instance, plaintiff moved a cocktail waitress hired by Van Vures into Chrisandrea's office area after plaintiff learned that she had accounting experience.

Regarding payroll, Schwing worked directly with Chrisandrea's accountants, ADP Payroll Company ("ADP"). She would forward to ADP a time sheet on which each employee's hours had been recorded. ADP would then provide Chrisandrea with a set of printed, unsigned payroll checks, along with a computer printout showing each employee's name, net wages, gross wages, income tax withholding, and FICA. Plaintiff signed payroll checks for

4 of the 12 pay periods during which Chrisandrea was in existence.

From its inception, Chrisandrea consistently lost money. By late November of 1983, Schultz had invested a total of over $120,000. On November 23, 1983, he decided to terminate Chrisandrea's operations. Havrilla, Wleklinski, and Van Vures voluntarily assigned to plaintiff their interests in the stock of Chrisandrea, and resigned as officers. The parties have stipulated that plaintiff assumed control of Chrisandrea's operations on this date. Judith Schwing remained with the corporation until it ceased doing business on December 23, 1983. She testified that sometime after Schultz took control, she gave him for the first time a list of creditors. The Internal Revenue Service ("I.R.S." or "Service") was not on that list.

Plaintiff hired an attorney, Kent Whitmore, to aid in winding up Chrisandrea's affairs. On December 6, 1983, plaintiff signed a tax return form, prepared for him by Whitmore, with respect to the third quarter of 1983. The third quarter begins July 1 and ends September 30. Consequently, Chrisandrea was only in operation for the last 16 days of the third quarter. The tax return indicated that Chrisandrea owed the I.R.S. $2,605.74. Although Chrisandrea's bank account showed an available balance on December 6 in excess of $78,000, plaintiff did not pay the amount shown due on the tax return form. Plaintiff testified that he signed the form on Whitmore's advice, that he was aware of the liability at that time, but that he was very distraught and does not know why the taxes were not paid. As to the large balance, plaintiff testified that he had received most of this money from a dividend, paid to him and his wife. His intention was that $14,000 of the amount received as a stock dividend was to go to Chrisandrea as a loan. The rest was to be returned to his wife.

Plaintiff testified that he was not aware of Chrisandrea's tax liability before December 6 when he signed the third quarter tax return. On cross examination, plaintiff was asked if he remembered testifying dur-

ing a deposition that in late November or early December he saw brown I.R.S. envelopes on Van Vures' desk. Plaintiff responded that he remembered seeing the envelopes, but that he did not know they were from the IRS. In rebuttal, defendant read into the record the relevant portions of the deposition:

"[Schultz:] I noticed these envelopes on the—these brown envelopes on the corner of the desk. Many [sic] Van Vures was sitting behind the desk. And he said nothing. And he just took them and threw them off to the side.

Then I asked Fred [Wleklinski], 'What the hell are these papers?' He said, 'Talk to Many [sic] [Van Vures] about it'.... I opened them up and it said Internal Revenue Service on it. And I opened it up and I said, 'Do you owe them some money, do we owe them some money.' He said, 'I don't know, not that I know of.'"

Tr. 65–66. During trial, plaintiff attempted to explain his deposition testimony, stating, "I did not learn [of the tax liability] at that time." Tr. 68. The court notes that paragraphs 15, 16, and 17 of the complaint state, in substance, that plaintiff knew at least by late November that the taxes were unpaid and returns had not been filed. While the evidence is not conclusive that plaintiff actually knew Chrisandrea was delinquent in paying its taxes when he saw the brown envelopes in late November or early December, the court is satisfied that plaintiff knew Chrisandrea had been contacted by the Internal Revenue Service. The court also holds that because the incident involved Van Vures, it must have occurred prior to November 23, 1983, the date on which Van Vures and the others left.

In May of 1985, the I.R.S. made a § 6672 penalty assessment against plaintiff in the amount of $20,691.38, representing the un-

paid trust fund employment tax liability of Chrisandrea for the third and fourth quarters of 1983, $1,822.24 and $18,869.14, respectively. In June of 1986, plaintiff made a $100.00 payment against his § 6672 penalty assessment. He thereafter timely filed a claim for refund. On January 12, 1987, the Service made an interest assessment of $1,275.69, and on February 9, 1987, plaintiff filed his complaint in this court.

In 1985 the other three officers of Chrisandrea were each assessed a penalty under § 6672 in the amount of $14,442.19, representing Chrisandrea's trust fund liability for the period prior to November 23, 1983, during which the three were deemed by the Service to be (jointly with plaintiff) responsible officers.[2] Fred Wleklinski paid $5,776.88 toward his penalty. This amount, by agreement with the Service dated December 14, 1985 (and as reflected in the Transcript of Account offered into evidence by the Government[3]) was treated as 100% satisfaction of his penalty. The Transcript of Account for Havrilla indicates that he has paid $5,289.56[4] toward the $14,442.19, and that the remaining $9,152.63 has been abated. His Transcript also indicates that there is a refund claim pending, although at trial he could not recall filing such a claim, either himself or through his accountant. There is no indication in the record that the claim has been denied. According to the Transcript of Account for Van Vures, the entire $14,442.19 penalty assessed against him has been abated. There is no indication of any payment by him, but there is indication of a claim pending.

## DISCUSSION

Employers are required to withhold from their employee's wages income taxes and FICA taxes. I.R.C. §§ 3101(a), 3102(a), 3402(a). There is no general requirement

---

**2.** As discussed more fully, *infra,* the Government is only entitled to one 100% satisfaction of the penalty.

**3.** Wleklinski's Transcript shows an abatement of $8,665.31. This is the difference between the total penalty of $14,442.19 and the $5,776.88 paid.

**4.** The Transcript of Account for Havrilla indicates payments in excess of $5,289.56. Because $9,152.63, the difference between $14,442.19 and $5,289.56, is the amount ultimately abated, the court will treat only $5,289.56 as going toward Havrilla's penalty.

that the sums withheld be segregated from other funds available to the employer, or that they be deposited in a separate bank account. *Slodov v. United States*, 436 U.S. 238, 243, 98 S.Ct. 1778, 1783, 56 L.Ed.2d 251 (1977). Instead, these funds are deemed to be a "special fund held in trust for the United States," I.R.C. § 7501(a), and are commonly referred to as "trust fund taxes." *Slodov*, 436 U.S. at 238, 98 S.Ct. at 1780. The I.R.S. credits an employer for the amount of income taxes which are required to be withheld, regardless of whether the employer ever actually pays these withheld funds over to the United States. *See Dougherty v. United States*, 18 Cl.Ct. 335, 339 (1989) (citing I.R.C. §§ 1462, 3102(a)). To facilitate collection when an employer does not pay its trust fund taxes, I.R.C. § 6672 imposes personal liability upon the person who was responsible for seeing that taxes were paid:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall ... be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

The term "person" as used in § 6672 "includes an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member, is under a duty to perform the act in respect of which the violation occurs." I.R.C. § 6671(b). The definition of "person" is meant to facilitate the collection of taxes from those who are ultimately responsible. *See Robert White v. United States*, 178 Ct.Cl. 765, 771, 372 F.2d 513, 516 (1967) (citing, *inter alia, Dillard v. Patterson*, 326 F.2d 302 (5th Cir.1963)).

A person who is under a duty to collect and pay any tax to which § 6672 applies is referred to as a "responsible person." This term is a creation of the courts, rather than a statutory definition, and is used as a matter of convenience. *See Slodov*, 436 U.S. at 246 n. 7, 98 S.Ct. at 1784 n. 7. One

is not liable, however, merely because he or she is a responsible person when § 6672 taxes are not paid. To be liable, a person must willfully fail to pay any delinquent taxes. *White*, 178 Ct.Cl. at 778, 372 F.2d at 520–21. The inquiry under § 6672 is thus twofold—whether plaintiff was a responsible person and, if so, whether he willfully failed to pay Chrisandrea's delinquent trust fund taxes.

**A. Was plaintiff a responsible person?**

Counsel for plaintiff conceded at trial that plaintiff was a responsible person after he took control on November 23, 1983, Tr. 329, and does not argue otherwise in its post-trial brief. The court therefore need only consider whether plaintiff was a responsible person before November 23, 1983. In making such an examination, the court must attempt to determine where the ultimate authority for the decision not to pay the taxes actually lay at that time, that is, who had the final word regarding which bills or creditors should be paid? *White*, 178 Ct.Cl. at 771, 372 F.2d at 516 (citing, *inter alia, United States v. Graham*, 309 F.2d 210 (9th Cir.1962); *Bloom v. United States*, 272 F.2d 215 (9th Cir.1959), *cert. denied*, 363 U.S. 803, 80 S.Ct. 1236, 4 L.Ed.2d 1146 (1960); *Schweitzer v. United States*, 193 F.Supp. 309 (D.Neb.1961)). This is primarily a factual inquiry. *See Bauer v. United States*, 211 Ct.Cl. 276, 286, 543 F.2d 142, 148 (1976).

■ There is ample indication in the record that plaintiff had ultimate authority and that, had he chosen to do so, he could have directed the payment of funds to avoid Chrisandrea's tax default. Judith Schwing testified that in a conflict she would have followed Schultz over the others. Furthermore, plaintiff clearly could, and in fact did, undermine the authority of Van Vures, the designated general manager, when he felt it to be necessary. Plaintiff took from petty cash for personal use. He exercised final personnel authority when he chose. Finally, it is noteworthy that it was plaintiff who, without seeking approval from the others, decided that the

operations would stop. There is no evidence that plaintiff ever deferred to the authority of the others. Rather, the evidence supports a finding that he did what he pleased at Chrisandrea. He could have used this authority to direct the payment of taxes.[5]

Plaintiff argues that under *Godfrey v. United States*, 748 F.2d 1568 (Fed.Cir. 1984), he should not be found to be a responsible person. In *Godfrey*, the Federal Circuit overturned the Claims Court's determination, 3 Cl.Ct. 595 (1983), that the plaintiff was a responsible person. Plaintiff in that case was a director and "the single most important individual directing the business affairs of the corporation." 748 F.2d at 1575 (quoting 3 Ct.Cl. at 605–06). He was the one to whom everyone looked for ultimate financial and other management decisions. *Id.* at 1574. He had the ultimate say on who was hired or fired, and knew the corporation was running behind on its tax obligations to the IRS. *Id.* The Federal Circuit held, however, that reversal was mandated because "[t]he Claims Court effectively held that Godfrey's *status* as a chairman cum advisor-negotiator—and the respect and deference accorded that status—amounted to 'ultimate authority' or 'power to control....'" *Id.* at 1575 (emphasis in original). The case law, the Federal Circuit held, would not support such a holding:

> In no case has an outside director of a publicly held corporation, who neither signed nor had the authority to sign checks, who did not participate in the day-to-day fiscal management of the corporation, who did not control the payroll, who did not determine which creditors would be paid and which would not, and who did not own a significant fraction of the corporations voting securities, been held a "responsible person."

*Id.*

*Godfrey* does not dictate a different result here. It is not plaintiff's position as president which leads the court to conclude he was a responsible person. The titles of Chrisandrea's officers in fact meant little. Instead, the court concludes that plaintiff actually possessed and exercised ultimate authority, and that he could have ensured that taxes were paid. *Godfrey*, furthermore, is distinguishable in that it involved an outside director of a publicly held corporation. Chrisandrea was a small, closely held corporation in which plaintiff was involved from the inside.

The court concludes that plaintiff was a responsible person during the period before November 23, 1983.[6] Plaintiff has conceded that he was a responsible person after that date. Plaintiff therefore was under a duty to collect and pay Chrisandrea's taxes during its entire existence.

### B. Willfulness

■ Having concluded that plaintiff was a responsible person, it remains to decide

---

**5.** Van Vures may also have had authority to direct payment of bills and taxes, and perhaps could have avoided the default as well. This however, does not relieve plaintiff of his duty. *See White*, 178 Ct.Cl. at 775, (quoting *Scott v. United States*, 173 Ct.Cl. 650, 657, 354 F.2d 292, 296 (1965)) ("'realistically read, [section 6671(b)] encompasses all those who are so connected with a corporation as to have the responsibility and authority to avoid ... a violation of [section 6672], even though liability may thus be imposed on more than one person'").

**6.** There is an early line of cases which suggests that even if a corporate officer has ultimate authority to direct payment of taxes and other bills, delegation of that authority will shield the officer from liability. *See Wiggins v. United States*, 188 F.Supp. 374 (E.D.Tenn.1960); *Cushman v. Wood*, 149 F.Supp. 644 (D.Ariz.1956); *Carrol v. United States*, 5 A.F.T.R.2d (P–H) 523 (E.D.Wash.1960). *Accord Campbell v. Nixon*, 207 F.Supp. 826, 829 (E.D.Mich.1962). Those cases are not applicable here. First, the court notes that recent cases often do not recognize the delegation exception. *See Grover v. United States*, 61 A.F.T.R.2d (P–H) 88–1234, 88–1237 (D.Mass.1987). Second, those cases that apply the delegation argument do so in a restrictive manner. *See, e.g., Dougherty v. United States*, 18 Cl.Ct. 335, 346 (1989) ("a delegation is only effective if it is comprehensive as to power and authority over corporate affairs and the ultimate control over corporate management is placed completely in another officer.") Even if plaintiff did attempt to delegate the duty to pay taxes to Van Vures or Judith Schwing, the court is satisfied that he retained his "power to compel or prohibit the allocation of corporate funds," *Godfrey*, 748 F.2d at 1576, and that any delegation, therefore, was ineffective.

whether plaintiff willfully failed to pay over to the Government the taxes owing. Willfulness for purposes of § 6672 has been defined as "a deliberate choice voluntarily, consciously, and intentionally made to pay other creditors instead of paying the Government." *Godfrey v. United States*, 748 F.2d at 1577, *quoting White*, 178 Ct.Cl. at 778–79, 372 F.2d at 521 (1967). Once a taxpayer has acquired knowledge of the tax liability, payment to other creditors with this knowledge is deliberate, and therefore willful. *Wood v. United States*, 808 F.2d 411, 415 (5th Cir.1987) (citing *Howard v. United States*, 711 F.2d 729, 736 (5th Cir.1983)) ("[a] considered decision not to pay the taxes owed, evidenced by payments to other creditors with the knowledge that the withholding taxes are due, establishes willfulness.") Willfulness, however, must also be viewed in light of the "personal fault" of the plaintiff, *see Godfrey* at 1577 (citing *Slodov v. United States*, 436 U.S. at 254, 98 S.Ct. at 1788), and relevant evidence bearing on personal fault cannot be ignored. *Id.* (citing *Feist v. United States*, 221 Ct.Cl. 531, 607 F.2d 954, 962 (1979)).

▮ Plaintiff in this case knew of Chrisandrea's tax liability no later than December 6, 1983, when he signed the third quarter tax return. Plaintiff executed a total of six checks after December 6. Five of these checks—to Sharon R. Schultz on December 7, to Bob Werner on December 9, to Carr Brothers on December 15, to Starlite Lamp on December 15, and to Kent Whitmore on December 20—are to credi-

tors of Chrisandrea.[7] The court therefore is satisfied that plaintiff, with knowledge that Chrisandrea's taxes were due, made payments to creditors other than the United States. This deliberate preference of other creditors, furthermore, was plaintiff's personal fault, because he was the sole person in control of Chrisandrea when the payments were made.[8]

At the very least, plaintiff's conduct was in reckless disregard of an obvious and known risk that taxes were not being paid. Under § 6672, this is willful conduct. *Godfrey*, 748 F.2d at 1577. The Seventh Circuit, in *Wright v. United States*, 809 F.2d 425, 427 (7th Cir.1987), set out a test for deciding when a taxpayer has been reckless: "the 'responsible person' is liable if he (1) clearly ought to have known that (2) there was a grave risk that withholding taxes were not being paid and if (3) he was in a position to find out for certain very easily." In this case plaintiff ought to have known when he signed the third quarter tax return without making any payment that there was "a grave risk that withholding [indeed, all] taxes were not being paid."[9] On December 6, there simply was no one else to pay these taxes. Plaintiff, furthermore, was in a position to find out for sure whether taxes were being paid—he could have checked with his attorney.

It might be argued that because plaintiff only signed a tax return for the third quarter[10], he was alerted to the third quarter tax deficiency only; that therefore he could

---

7. The other check, for $9,900.00, was to "Cash".

8. The court notes additionally that between December 6 and December 20, Chrisandrea's account balance at the Park Bank of Florida never went below $20,000, and was over $78,000 on December 6, the day the third quarter return was signed. Although plaintiff testified that the high balance was due to deposit of a stock dividend payable to himself and his wife, and that he was only making a loan of $14,000 to Chrisandrea at that time, the balance on December 1, the day before the sudden surge in available cash, was $9,823. This, coupled with the $14,000 loan admitted by plaintiff, would have made over $23,000 available to Chrisandrea. Chrisandrea, therefore, had the ability to pay all the taxes due.

9. Indeed, he should have known that taxes were not being paid when he saw the brown envelopes in late November. *See Wright v. United States*, 809 F.2d at 427 (in discussing the meaning of recklessness, the court states, "... the purpose of the statute would be thwarted, just by, ... adopting a 'hear no evil—see no evil' policy....").

10. In February of 1984, two months after Chrisandrea was dissolved, plaintiff signed the tax return for the fourth quarter of 1983. There is no indication from the record that he made any payment toward Chrisandrea's unpaid trust fund taxes at that time.

only have acted willfully with respect to the taxes shown there, and not as to the larger, fourth quarter deficiency. The court, however, rejects that contention. The third quarter tax return should have alerted plaintiff to a tax problem generally. Line 15 of the return states, "Enter here and pay to the Internal Revenue Service—$2,605.74." Even a taxpayer of plaintiff's modest experience would have had to wonder whether this small amount represented all the taxes owed by Chrisandrea. At the very least, plaintiff was reckless regarding fourth quarter taxes—plaintiff ought to have known, after seeing the third quarter tax returns, that there was a grave risk that taxes in general (and hence, the fourth quarter taxes) were not being paid, and he was in a position to find out for certain by asking his attorney.

■ In holding plaintiff liable for all taxes accrued since Chrisandrea's inception in September, even though the parties have stipulated that he only assumed control on November 23, this court is not in conflict with the spirit of *Slodov*, 436 U.S. 238, 98 S.Ct. 1778. In *Slodov*, the Supreme Court held that a taxpayer who assumes control of a corporation is not liable for trust funds accumulated and dissipated by predecessors. The taxpayer was permitted to use funds acquired after he assumed control to pay creditors instead of paying the trust fund taxes accumulated before his arrival. The present facts are distinguishable. In *Slodov*, the taxpayer came in as a complete outsider. His assumption of control therefore marked the beginning of his responsibility to collect and pay taxes. In contrast, plaintiff in this case was a responsible person throughout Chrisandrea's existence. The only significance of November 23, 1983, therefore, is that afterwards the other three owners were no longer co-officers.

No basis exists here for isolating the period of time prior to plaintiff's assumption of control.[11]

■ Although plaintiff is liable for the full amount of the penalty assessed against him, the Government is entitled to only one "successful satisfaction" of the 100% penalty assessment. *Gens v. United States*, 222 Ct.Cl. 407, 415, 615 F.2d 1335, 1339–40 (1980), *cert. denied* 459 U.S. 906, 103 S.Ct. 209, 74 L.Ed.2d 167 (1982). "Successful satisfaction" is the right to retain the collected assessment, *see id.* at 415, 615 F.2d at 1340, and is obtained when the statutory period for commencement of a refund suit has expired or, if a refund suit has been filed, when there has been a final adjudication. *Id.* There is a two year statute of limitations for filing a refund claim on a § 6672 penalty assessment. *See USLIFE Title Insurance Co. v. Harrison*, 784 F.2d 1238 (5th Cir.1986).

Wleklinski has paid $5,776.88 toward his penalty. According to his Transcript of Account (and as conceded by the Government in its post-trial brief at page 10) he has not filed a claim for refund. Havrilla has made payments totalling $5,289.56 toward his $14,442.19 penalty. The Transcript of Account for Havrilla (as well as Van Vures, who has made no payments), however, indicates a claim pending. Thus it is only with respect to Wleklinski that the two year limitations for filing a refund has passed, and that the Government has the undisputed right to retain any money it has collected. Plaintiff's penalty will therefore be abated by $5,776.88, which represents that portion of Chrisandrea's total liability on which the Government has obtained "successful satisfaction."

## CONCLUSIONS

Plaintiff was a responsible officer during the entire time that Chrisandrea was in

---

11. It might be argued, of course, that there is a basis for segregating the trust funds accrued on the theory that *Slodov* applies when, as here, a person only becomes willful as of a certain date (in this instance by acquiring knowledge no later than December 6). That argument has been squarely rejected. *See Garsky v. United States*, 600 F.2d 86 (7th Cir.1979). In *Garsky*, the court held that a responsible person cannot be relieved from liability for taxes accrued and

dissipated before he becomes aware of the failure to pay such taxes. In so holding, the court stated, *"Slodov* does not relieve a 'responsible person' of the responsibility to reduce the accrued withholding tax liability with funds acquired after the funds actually withheld have been dissipated so long as the person responsible has been so throughout the period the withholding tax liability accrued and thereafter." 600 F.2d at 90.

existence, and willfully failed to pay that corporation's trust fund taxes. He is liable for the full $20,691.38 in unpaid trust fund taxes, less $5,776.88, plus interest. Accordingly, the clerk is directed to enter judgment for the defendant on its counterclaim in the amount of $14,914.50, plus accumulated interest. Plaintiff's claim is dismissed.